.No. 31.—RICHARD A. LANE, plaintiff in error, *vs.* HENRY
HARRIS, defendant in error.

[1.] Public Statutes, and the facts which they recite or state, must be no-
ticed by the Courts, without their being stated in pleading.  And this rule
is not in conflict with what was decided in *Dougherty vs. Bethune,* (7 *Ga.*
90.)

[2.] The provision of our Statute, " that no person shall be permitted to deny
any deed, bond, bill, single or penal note, draft, receipt or order, unless he,
she or they shall make affidavit of the truth of such answer, at the time of
filing the same", applies only where the execution or *factum* is alleged to be
the act of the party filing answer, or adopted by him.

[3.] Where, under the provisions of a bank charter, it is sought to hold a ·
stockholder liable, who is thereby bound for the ultimate redemption of the
bills, by proof of the bank's insolvency : *Held,* that the best and most rea-
sonable rule which can be prescribed for such a case is, that the return of
*nulla bona* on an execution, against the assignee of the corporation, should
not be considered conclusive against the stockholder, unless due and pro-
per notice be previously given him, that the *fi. fa.* is placed in the Sheriff's
hands, with instructions to levy.

[4.] In an action against a stockholder, who is bound for the ultimate re-
demption of the bills issued by a bank, "in proportion to the amount of
shares, and the value thereof, that each individual or company may hold in
said bank, in the same manner as in common actions or debt", when the
record does not show that there are any other bills of said bank due and
unpaid, or that there has been any other recovery against this stockholder,
upon bills of the bank : *Held,* that the bill-holder is entitled to recover the
whole sum claimed by him, if it do not exceed the amount of stock owned
by the defendant : *Held* also, that should any other action be brought
against the same stockholder, on bills of the bank, when he has redeemed
bills to the extent of his stock, he may plead such payment, in bar of any
further recovery against him.

Debt, in Meriwether Superior Court.  Tried before Judge
STARKE, February Term, 1854.

.This was an action brought by Richard A. Lane, against
Henry Harris.

The declaration set out that Harris was a stockholder in the
"Planter's & Mechanic's Bank of Columbus", to the amount
of one hundred shares of stock, rated at one hundred dollars.
per share.  The charter of the bank provided, "that the per-

sons and property of the stockholders shall be pledged and held bound, in proportion to the number of shares and the value thereof, that each individual or company may hold in said bank, for the ultimate redemption of the bills or notes issued by said bank, in the same manner as in common actions of debt."

The plaintiff alleged that he was the holder of bills of the bank, to the amount of $1.925, on which he had obtained a judgment against Robert B. Alexander, as assignee, appointed by the Legislature to take charge of and wind up the affairs of the said bank : on which judgment execution had been issued, and return of *nulla bona* thereon by the Sheriff.   Plaintiff sought, in this action, to make the defendant, Harris, liable for the payment of such a proportionate part of the debt due him by the bank, as the stock owned by defendant constituted, of the entire capital stock of the bank.

Subsequently, plaintiff filed an amendment to his declaration, stating the same facts, but charging that defendant was liable for the entire amount of the bills held by him—that is, $1.925, and seeking judgment accordingly.

The defendant filed several pleas, among which was one, that there was real and personal estate, still owned by said bank, on which the *fi. fa.* of plaintiff might be levied, sufficient to pay it off.

At February Term, 1854, the parties having announced themselves ready for trial, and before submitting the cause to the Jury, defendant's Counsel demurred to the amendment to the declaration above stated ; and the Court, after argument, pronounced the following judgment:

" The defendant's Counsel having demurred to the amendment to the declaration in this case, filed since the last term of this Court and served on the 24th day of November, 1853, on the ground that the measure of damages and liability, as claimed by said amendment, is not that fixed by the 11th section of the Act incorporating the Planter's and Mechanic's Bank of Columbus, and after hearing the argument of Counsel, *It is ordered,* that said demurrer be sustained, so far as to preclude the plaintiff from

recovering the whole amount of the bills held by him and described in his declaration—it being the opinion of the Court that he only has the right to recover of the defendant, under the pleadings, such a proportion of his bills as the stock of the defendant bears to the whole capital stock of the bank. To which ruling and decision of the Court, the plaintiff's Counsel excepts; it being agreed that the Court should pronounce a judgment, as to the extent of the liability of the stockholders, under the 11th section on this demurrer.

The plaintiff's Counsel then demurred to and moved to strike out all the pleas filed by the defendant, except the first, which is the general issue, and the last, which asserts that defendant never was a stockholder in the "Planter's & Mechanic's Bank of Columbus", and so much of the ninth plea as alleges and sets forth that there has been collected, and in the hands of the assignee, an amount sufficient to pay plaintiff's demand; and after hearing the argument of Counsel and considering the same, the Court sustained said demurrer and motion to the extent made, except as to so much of the ninth plea as alleges and sets forth that the bank is not insolvent, and has real and personal property, to-wit: banking house and lot and other lots, in the City of Columbus, on which plaintiff might have levied his execution, and of sufficient value to pay and satisfy the same. And to that portion of that plea, the demurrer and motion was over-ruled; to which over-ruling and refusal of said motion, as to said portion of said plea, the plaintiff's Counsel excepts.

The plaintiff's Counsel then submitted said cause to the Jury, and offered, in evidence, a number of bank bills purporting to have been issued by said Planter's & Mechanic's Bank of Columbus, of various denominations and dates, and payable to different persons; amounting, in all, to the sum of Nineteen Hundred and Twenty-five Dollars, answering the description of those set forth in the plaintiff's declaration, and of which the following is, in substance, a copy, except as to dates, amounts, letters, numbers and payees, and a portion signed by A. B. Ragan, as Cashier, to-wit:

Lane *vs.* Harris.

No.                                                    673 X.
    10                        .                             10
        A    ·    STATE of GEORGIA.
.The Planter's & Mechanic's Bank of Columbus, will pay Ten
Dollars, on demand, to W. Wright or bearer.   Jan'y 9th, 1840.
                                      Columbus, Georgia.
X    M. ROBERTSON, Cash'r.        D. McDOUGALD, Pres't.

The defendant objected to said bills going to the Jury, until
the plaintiff proved that they were issued by the bank; that
is, that said persons, signing and counter-signing said bills,
were officers of said bank, as therein represented, and that
their signatures were genuine; and also, on the ground that
the requisitions of the charter of said bank had been complied
with; and after considering said objections, the Court over-
ruled the latter ground of objection and sustained the former.
To which ruling of the Court, requiring of the plaintiff the
proof of the execution of said bills, plaintiff excepts.

The plaintiff's Counsel then proved, by Hines Holt and
John L. Mustian, that the signature of D. McDougald as
President, and Matthew Robertson and A. B. Ragan as Cash-
iers to said bills, were genuine; and that they were the acting
President and Cashiers of said bank.   Whereupon, said bills
were made evidence to the Jury.

The plaintiff's Counsel then offered to read in evidence to
the Jury, an exemplification from the Superior Court of Mus-
cogee County, showing the institution, in that Court, by the
plaintiff, a suit founded upon and for the recovery of the same
bills mentioned in the declaration in this case, returnable to
the May Term, 1849, of said Court, against Robert B. Alex-
ander, as assignee of the said Planter's & Mechanic's Bank of
Columbus—a judgment against said assignee, for the sum of
Nineteen Hundred and Twenty-five Dollars for his principal
debt—the sum of Seven Hundred and Seventy Dollars for his
interest and for cost of suit, to be levied of the goods and chat-
tels, rights and credits, lands and tenements of said Planter's

& Mechanic's Bank—the issuing of an execution on said judgment, and the return of the same by the Sheriff, with entry of " no property to be found to levy the same".

The defendant's Counsel objected to the same being read to the Jury, on the ground and for the reason, that there was no allegation in plaintiff's declaration, that the forfeiture of the charter or dissolution of the corporation, and the appointment of Robert B. Alexander assignee of said bank ; but on the contrary, the declaration alleges that said bank is yet in existence—which objection was sustained by the Court and the evidence rejected.   To which ruling and decision of the Court, plaintiff's Counsel excepts.   The plaintiff's Counsel then read to the Jury a certificate, signed by A. B. Ragan as Cashier of said bank, and attested by D. McDougald as President thereof, stating that the defendant was entitled to and held one hundred shares of the capital stock of said bank ; and on the introduction of the testimony, plaintiff closed his case.   Whereupon, defendant's Counsel moved the Court to non-suit the plaintiff; and after considering the same, the Court sustained the motion and gave the following judgment, to-wit :

" The plaintiff having closed his evidence, and having failed to show any judgment or proceeding against the bank, for the recovery of his said demand, prior to the suit, to infer the ultimate liability of the defendant as a stockholder, and the defendant having moved a non-suit, the Court ordered the same, offering to the plaintiff the right to confess judgment, and appeal or have a verdict against himself".

To which ruling and decision the plaintiff's Counsel excepts.

DOUGHERTY ; E. A. NISBET, for plaintiff in error.

H. WARNER ; TOOMBS, for defendant.

The Court not being unanimous, the opinions of the Judges were delivered *seriatim*.

*By the Court.*—STARNES, J. delivering the opinion.

[1.] The ground of error first assigned in this case, was the

ruling of the Court, in withholding from the Jury the exemplifications offered by the plaintiff, showing the suit against Robert B. Alexander; assignee, a judgment and execution thereon, &c.

The reason given for this decision of the Court below was, that in the petition there was no allegation that the charter of the Planter's and Mechanic's Bank had been forfeited, and that an assignee had been appointed. And it was insisted for the defendant in error, that though a recital or recognition of both these facts was to be found in the public laws of the State, yet that no party could have the benefit of a public law, without proper pleading.

This latter remark may be very correct: but what is necessary to *proper* pleading is the question—just the question, here.

It seems to be well settled, that setting forth a public statute, and the facts which it recites, is not necessary to proper pleading. "Public statutes, and the facts which they recite or state, must be noticed by the Courts, without their being stated in pleading." (*Bac. Abr. Stat. L.* 2 *Wils.* 376. *Willes,* 210. *See the reasons of Lord Ellenborough,* 4 *M. & S.* 542. 1 *Black Com.* 86. 1 *Ch. P.* 246.)

This rule is not in conflict with what was decided by this Court, in *Dougherty vs. Bethune,* (7 *Ga. R.* 90.) There the decision was, that the recital of a fact in a public statute, did not operate to estop a party defendant from denying it by plea, and putting the fact in issue. It was not held, that it was necessary for a plaintiff suing, to set forth such a fact, although it were recited by a public statute; but simply, that the defendant might deny it in his plea, and in this event the plaintiff must prove it. And this Court afterwards says in *Beall vs. Beall* (8 *Ga. R.* 210,) and in *Thornton vs. Lane* (11 *Ga. R.* 521) that although such facts may not be conclusive, Courts must "treat them as true, until the contrary appear." The inference from which is, that whilst they remain uncontroverted, as facts stated or recognized by a public statute, the rule of pleading which we have been considering, applies.

The forfeiture of the charter, and the appointment of the

assignee referred to in this case, were facts which fall within this rule, and it was not necessary that they should have been pleaded.

[2.] The question next presented is, whether or not it was necessary for the plaintiff to prove the execution of the bills on which the suit was based, they not having been denied on oath?

It is our opinion, that this provision of our Statute, declaring that "no person shall be permitted to deny any deed, bond, bill, single or penal note, draft, receipt or order, unless he shall make affidavit of the truth of his answer, at the time of his filing it," (*Cobb. Dig.* 486) applies where the execution or *factum* is alleged to be the act of the party filing the answer, or adopted by him. In the case before us, the liability of the stockholder is not placed upon any act of his, in connection with the execution of the bills. If he be liable, he is so, not because by the *factum* he has promised to pay these bills, but because of the fact, that by becoming a stockholder, and subjecting himself to the terms of the Statute in such case made and provided, he has, as it were, guaranteed the payment of the bills. His guarantee is not like that by endorsement; for in that event, it might be said, that he had adopted the *factum:* but he has guaranteed them only, by becoming a stockholder under the provisions of the act of incorporation. For aught that is known to him, or for any thing that he has done, the bills on which this suit was based, may have been all spurious.

Let us take a case which will readily serve as an illustration: A contracts with B by letter, or otherwise in writing, for a sufficient consideration, to guarantee all bills which C may draw on D in favor of B within a specified time, and not exceeding a certain amount. C draws a bill which is accepted, but not paid by D; and B brings suit against A. Now, if the action had been instituted against C and D, the drawer and acceptor, it is very plain that by our Statute they would not be permitted to deny the genuineness of the instrument, save upon oath. But it seems equally plain, that this rule should not apply to A, who knew nothing, and could be supposed to know nothing

of the *factum ;* and was responsible only by *collateral* guarantee.

For a similar reason, the execution of the bank bills sued on in this case should have been proven.

[3.] It was also insisted, that the Court below erred in overruling the demurrer of the plaintiff to so much of the ninth plea as alleges and sets forth, that the bank has real and personal estate in the City of Columbus, on which the execution of plaintiff could have been levied, and of sufficient value to satisfy the same.

This raises the question, whether or not the return of *nulla bona* made by the Sheriff on this execution, is conclusive against the stockholder. A question not without considerable difficulty.

On the one hand, it would seem that more should not be required of the bill-holder, than that he should pursue the due and ordinary course of law in exhausting the property of the bank; that this is a reasonable and practical test of his diligence ; that any diligence beyond this, should reasonably devolve upon the Sheriff, whom the law appoints to assume such responsibility and exercise such diligence, and who is in a position to do it with advantage; or upon the stockholder who has an ultimate liability, was interested in the issuing of the bills, and may have made gains and profits by them, and who being, as it were, in community of interest with those who issued the bills, and are holding the effects of the corporation, (if there be any) thus possesses facilities which may enable him to discover effects, and have them subjected to the payment of the bills. Something like an analogous rule prevails in other cases, where there is an *ultimate* liability. The return of *nulla bona*, upon an execution issued on a judgment against an administrator for a *devastavit*, is conclusive, as against the sureties, in an action against them on the bond. A return of *non est inventus*, by the Sheriff, upon a *ca. sa.* issued in an action where bail had been taken, is conclusive against the bail, in a suit upon the recognizance.

To this may be added the consideration, that if the stockhol-

der be allowed to take issue on the Sheriff's return, that issue may be determined in his favor, on the ground that the defendant has property which could have been subjected to levy; and when this property is levied on, it may be claimed by another person under our laws; and upon the trial of that issue, the claimant may succeed. The bill-holder is then remediless. But should the case not reach this fatal crisis for him, out of the first issue, (the trial of the question, whether or not the bank does own and possess property subject to the execution,) new and collaterial issues may arise, it may even become necessary for a Court of Equity to intervene, and thus this proceeding, to ascertain the bank's insolvency, may become so exceedingly intricate and prolonged as to deprive it very much of practical advantage. And all these issues have to be met and tried by the bill-holder, with the disadvantage, perhaps, of being a stranger to all the parties, and without facilities for procuring information and testimony.

On the other hand, it must be admitted that the stockholder, in this case, was no party to the proceeding against the bank, if he were not cognizant of the suing out of the execution, and the efforts of the Sheriff to find property of that bank; (and if he had been so apprised, he could have pointed out property,) would have no inconsiderable cause of complaint, should he now be concluded by the Sheriff's return. It would seem but reasonable, that he should not be held responsible, unless he had had some notice of the effort to find property; as such notice might have put him upon diligence, and have enabled him to protect himself.

If this stockholder, in reference to this transaction, that is to say the emitting of these bills by the bank, could certainly be regarded as a *privy*, I should doubt the legal necessity of such a notice; but from what I have said on another point, it is evident that I regard him, in his peculiar relation to these bills —a relation created by statute, as a sort of guarantor, by a contract separate from that on which this bill-holder obtained.

his first judgment. As such, notwithstanding his community of interest with the corporation, with reference to these bills, I doubt if he can be said to be in *privity* with it, in the accurate Common Law sense of that term; for which, see *Vin. Abr. Tit. Privity, Co. Litt.* 271, *a.* 8 *Co.* 42 *b.* And if he be not in the relation of either party or privy, it is not unreasonable to require that he should have such notice.

Even in the case of bail, though their relation to the principal is so intimate a one, I find, that according to the long established practice in England, it was directed that the *ca. sa.* should lie four days in the office, in order to give the bail, notice, that the plaintiff had elected to take out execution against the person of the principal, so that they might have the opportunity of rendering his body before the *capias* issued. *Merritt vs. Montfort, (Barnes,* 54. 2 *Salk.* 599. *Petersd. on Bail,* 358.) And in the case of a return of *nulla bona,* on an execution issued upon a judgment against an administrator for a *devastavit,* to which reference has just been made by me, may it not be, that in view of the close interest between the principal and his sureties, and the fact that that interest is created by the same instrument or contract, the return is considered conclusive, partly because the judgment is regarded as notice to the sureties, that a *fi. fa.* will be sued out, and the Sheriff put upon the search for property?

In view of all these things, and especially in consideration of the fact, that the peculiar statutory liability of this stockholder places him in a relation to the bank, which is not precisely analogous to that of either party or privy at Common Law, I am willing to unite with my brethren in holding, that the best and most reasonable rule which can be prescribed in such a case is, that the return of *nulla bona* should not be considered conclusive against him, unless due and proper notice be previously given to him, by which he may, if he choose, be put upon diligence in the search for property.

[4.] Lastly: it is insisted, that the Court erred in holding, that the plaintiff was entitled to recover only " such a proportion of his bills, as the stock of the defendant bears to the

whole capital stock of the bank," and in ordering the amendment by which he sought to recover his whole claim, stricken out.

The effect of this decision was equivalent to the declaration, that the plaintiff, in this case, who brought suit on *nineteen hundred and twenty-five dollars*, of bills, against a stockholder owning *one hundred shares*, out of the *ten thousand shares*, of which the capital stock consisted, (*or ten thousand dollars* of the *one million* of capital stock,) was entitled to recover on the bills held by him and sued upon, only the proportion of of *one hundred shares* to *ten thousand;* that is to say, the *one hundredth* part of his claim, or *nineteen dollars and twenty-five cents.*

The determination of this question turns mainly upon the construction which is to be placed upon the language used by the Legislature in the eleventh section of the Act incorporating this bank, viz: that the persons and property of the stockholders shall be bound for the ultimate redemption of the bills, " in proportion to the amount of shares, and the value thereof, that each individual or company may hold in said bank."

It must be observed, that the language here is not, that the persons and property of the stockholders shall be bound *in the proportion which his shares bear to the whole capital stock of the bank*, but it is, *in proportion to his shares.* The proportion stated, is not a comparative relation of *his shares* to the *capital stock*, but such a relation of *his liability* to the *number and value of his shares.* He shall be liable, says the charter, in proportion to what he owns of the stock. Nor does the act of incorporation say, that the stockholder shall be bound for the ultimate redemption of the bills to *each* bill-holder "in the proportion his shares bear to the whole stock," which is the effect of the construction in the Court below, but it simply asserts a general liability for the redemption of the bills, (that is *all* the bills,) in proportion to the amount of his stock. It is very plain, therefore, that the proposition stated by the Court below, in the use of the words "which his stock bears to the whole capital stock," is an interpolation on the Statute.

But it is urged that it is necessary to give this construction to this provision of the charter, in order to avoid substituting an injustice for a difficulty.   Let us see what is the true value of this assertion.   If it be correct, then, of course, the method or mode of proceeding which this construction requires the bill-holder to adopt, in enforcing payment of his bills, is that which is equitable, practicable and just.   We will put it to the test.

The Act incorporating the Georgia Rail-road & Banking Company contains a provision similar to that under consideration, making the persons and property of the stock-holders liable for the ultimate redemption of the bills.   And no one will question, that the Legislature intended that this provision should have the same signification and effect in both charters, and in all the charters of banks in our State, where it may be found.   Now the capital stock of the institution I have just mentioned, is upwards of four millions of dollars ; there are some seven hundred stockholders, at present, and it is possible there might be as many stockholders as shares ; that is to say, more than forty thousand.   For many years, this bank has had a circulation of near one million of dollars.   If it were to become insolvent, what would be the consequence?   By the provisions of the charter, these numerous bill-holders have, or were intended to have, a remedy against the stockholder, for the payment of their bills, " as in common actions of debt"; and according to the construction which prevailed in the Court below, (and which is insisted on as that only which is just,) in order to have the benefit of this provision secured by the Act, each of these bill-holders would be compelled to institute suit against at least seven hundred, possibly forty thousand stockholders.   This would be hard enough—perhaps impracticable and out of the question, even if the bill-holder happened to possess some hundreds or thousands, in bills of the bank.   But let us suppose that he had only a small amount (he might have but five dollars, or even one dollar) of these bills.   In reason, justice, and according to law, he would be as much entitled to have payment for that, as for thousands.   It might, indeed,

be the *all* of the widow or the orphan. In order, however, to have the benefit of the rights which the charter secures, that bill-holder not being able, according to law, to join these several promissors in one action, would be constrained to institute at least seven hundred suits for the recovery of that small amount of money. If he attempted to do this, it is altogether probable, that out of seven hundred defendants, some would be found bankrupt or out of the jurisdiction of the State, and not accessible by the ordinary process of law; and almost certain, that by some one or more of the many casualties and contingencies which cluster around every action at law, and against which the most astute and provident Counsel cannot always provide, he would lose one or more of these suits. And is it not absolutely certain, that the prospect of these results, and of the amount of Counsel's fees, for cases lost and won, which he would have to pay, would operate as a prohibition to his bringing such suits or having the benefit which the charter intended to secure for him ?

Let it not be said, that he could part with his bills to some one having more of them, and who could afford to sue, for this is as much as to say, that he could *sell them at a sacrifice*. It should not be believed, for a moment, that in legislating so important a provision, for the benefit and protection of bill-holders, the General Assembly of our State intended to make such a sacrifice necessary to the poor man or the small bill-holder. That body certainly designed to put every citizen upon the same footing of reason and justice, and to supply a ready and efficacious remedy to each and all.

The illustration thus presented, serves strongly to show the hollowness of that boasted justice attributed to the construction contended for by the defendant in error, of that provision which we have been considering.

I cannot consent to impute such a scheme to the legislative mind, and turn from it, to some more just method of enforcing this provision of the charter.

So far as the rights of bill-holders are concerned, it would be better, if what the stockholder is liable to pay, could be dis-

tributed among all the bill-holders. And this would be the direction given to it, if it were paid into a Court of Chancery, to be disposed of upon equitable principles. But this is rather a matter of interest to the bill-holders than to the stockholders. It does not operate any greater hardship on the stockholder, if he pay to one bill-holder, than if he pay to all the bill-holders, provided he be protected in making such payment against any farther recovery. If he is liable, it is right that he should pay to some one; and the Legislature, in its sovereign discretion, has said that he shall be made to pay (if he will not without suit) by an action at Common Law, and not in Equity, unless the bill-holder desire it; that he shall be held liable, "as in common actions of debt." He cannot be so held liable, practically, and this provision of the Legislature is effectually defeated and set at naught, as I have shown, if payment can be enforced only in the way made necessary by the construction I have been opposing. There is no other method by which payment can be coerced, "as in common actions of debt," except that which permits and authorizes a recovery for the whole amount of the claim from any stockholder whose shares are sufficient to meet the payment. The bill-holder can thus recover his claim, and have the full benefit which this provision of the Statute was intended to secure to him.

This construction gives effect to the Statute, and carries the obvious intention of the Legislature into effect, by supplying every bill-holder with a speedy and efficacious remedy. In order, therefore, to give complete effect to this provision of the charter, creating a statutory liability, if there were no analogy at Common Law, it would be necessary to adopt a construction which holds, that the stockholder became liable to pay every, or any of the bills to the extent of his stock; that he guaranteed each so far as the extent of his stock, and not a portion of each bill, sufficient, in the aggregate, to make up the amount of his stock; and that this liability ceases when an amount has been recovered from him, equal to the value of his stock; and such recovery he can plead in bar of any other action against him by a bill-holder. This construction interpolates nothing on the

Statute, and does no violence to its terms; but on the contrary, is in harmony with the simple and ordinary signification of the words employed.

I can conceïve that another construction might be placed upon the words, "shall be pledged and bound, in proportion to the amount of shares and the value thereof, that each individual or company may hold," &c., if the question were presented, as to the extent of the stockholder's total liability, with reference to the whole circulation of the bank. If, at the time of the dissolution, or perhaps at the time of the suit's commencement, (should the assignee have redeemed some of the bills after the dissolution,) the whole amount of bills was greater or less than the whole amount of the stock, the liability of the stockholder would be on all of them; and it would seem not unreasonable, that in such case, it should be in proportion to his stock. If the circulation exceeded the capital stock, then his liability would transcend his stock, in the proportion which that stock bore to the whole capital stock of the bank. If the circulation, was less than the capital stock, then his liability would be less,. in a similar proportion. For example: if the circulation had been *one million one hundred thousand*, at the time specified, this stockholder's liability being *one per cent*, or as *one hundred* shares is to *ten thousand*, he would be liable to pay *eleven thousand* dollars of the bills. But if the circulation was only *nine hundred thousand*, then he would be liable to pay only *nine thousand* dollars of the bills. The recovery, however, in a particular case, would not be of a certain per cent. on each bill sued upon by a bill holder, according to the construction which I have been opposing, but would be for the whole amount of the bill-holder's claim, provided it did not exceed the proportion of the stockholder's liability.

It is possible that the terms of the charter, which we are considering, may have been employed, in part, at least, in the sense which I have just expressed. But it is unnecessary to decide this question, as it is not presented by this record. There is before us no evidence, as to the amount of bills in circulation at any time, and no evidence that there is, now, any

other bill-holder of this bank, besides him who is now before the Court. For anything that appears in this record, all the other bills may have been paid by the effects of the bank. On such a record, I cannot, for a moment, doubt that the plaintiff is entitled to recover the whole of his claim against the defendant in error.

The construction which I place upon this statutory liability of the stockholder, has its analogies in other liabilities at law. An example may be found in the liability of sureties upon a Sheriff's bond. Although many persons be injured by the misconduct of the Sheriff, if one vigilant suitor exhaust the penalty of the bond, no further recovery can be had thereon, against the sureties, by any other person. But I will put a case still more to the point. We will suppose, that on the same day, for a similar consideration, and payable at the same time, A gives his promissory notes, payable to bearer in different sums, amounting, in all, to twenty thousand dollars, to twenty payees. Desirous of using these notes in some common transaction, these persons, by a separate instrument, in writing, agree to guarantee the notes, each severally binding himself for the payment of the whole, in proportion to the amount of the note received by him from A provided A should, himself, be unable to pay. The notes are then transferred and assigned to other persons, upon the faith of this guarantee. Sometime after they have become due and payable, C a holder of one amounting to one hundred dollars, brings his action thereon, and upon the guarantee against B a guarantor, and one of the original payees of a note, amounting to one thousand dollars, proves the insolvency of A in the proper way, and demands a judgment against B. Now, if he had sued in Equity, or if the holders of the other nineteen notes had filed their bill and taken him there, and had shown that their notes were unpaid, then, perhaps, he could have recovered from B, only such proportion of his claim as B's note bore to the whole amount; that is to say, the one-twentieth part thereof. But C is not taken into Equity, we will suppose, and no objection is made by the other note-holders, to his recovery—they may have been

all paid by A's property, for anything that appears in the proceeding. Can there be any doubt, for a moment, of C's right to recover his whole claim from B?

It would not be difficult to find other analogies; but the length to which this opinion has already reached, admonishes me to forbear.

Let the judgment be reversed.

LUMPKIN, J. concurring.

The Court being of one mind, as to the first three grounds of alleged error, I shall address myself to the fourth only—which is, that the presiding Judge held that the plaintiff could recover such proportion of his bills only, as the stock owned by the defendant bears to the whole capital stock of the bank.

Now, the counter proposition to this and that which I hold to be true, is, that the plaintiff is entitled to recover the whole amount of his bills out of the defendant, provided the number of his shares and the value thereof, estimated at $100 per share, is equal to the amount of the bills sued on. And there being a diversity of opinion among the members of the Court, upon this point, I shall proceed to state the reasons, as it is made my duty to do, in support of the view which I entertain.

This action is brought on the XIth section of the charter of the Planter's & Mechanic's Bank of Columbus, which is in these words: "the persons and property of the stockholders shall be pledged and held bound, in proportion to the amount of shares and the value thereof, that each individual or company may hold in said bank, for the ultimate redemption of the bills or notes issued by said bank, in the same manner as in common actions of debt; and no stockholder shall be re-

Lane vs. Harris.

lieved from such liability, by sale of his stock, until he shall have caused to be given sixty day's notice, in some public gazette of this State". (*Prince's Digest,* 127.)

The case must be decided, of course, upon the proper construction of this clause in the charter, the phraseology of which is not so explicit, perhaps, as it might have been.

The following positions, I believe, are not denied or doubted in any quarter; at least, they are too well established to be successfully controverted :. That under this and similar provisions, in bank and other charters, the liability of the stockholders is several, not joint; that inasmuch as the measure of this statutory liability may be wholly different in each case, depending upon the number of shares held respectively by the stockholders, a joint suit, at Law, would be impracticable, as there could be no joint judgment; that the Act does not intend that the stockholders should be sureties for each other— each being severally responsible for the amount of his own stock, and no further. Some of the stockholders may have removed beyond the jurisdiction of the Court, so as not to be reached by its process, or affected by its judgment: or have become insolvent; still, under this section, those who are liable and solvent, cannot be made to pay more than they otherwise would, on that account. That the remedy provided by the XIth section of the charter, is not only essentially, but *exclusively* a *Law* remedy; the liability, whatever it is, is to be enforced "in the same manner as in common actions of debt". That if the redress at Law should prove to be inadequate, from any cause whatever, the Superior Court, sitting in Equity, will take jurisdiction over a bill filed by one or more of the creditors, in behalf of himself and others, against all the stockholders who are solvent and suable, concurrently with a Court of Law, over separate actions, against each of them, upon his sole and separate liability. That in Equity, the rights of all concerned, on both sides, might be considered at once. It might be considered how much was due in the whole and to all those who should choose to adopt this remedy; and a decree might go against each for his share of the liability; that it is the privilege of

Lane *vs.* Harris.

the bill-holder to elect his forum ; he may go into Chancery,. but he cannot be compelled to go there ; that the Equity jurisdiction in such case, is not derived from the Statute, but is deducible from the acknowledged powers of a Court of Chancery.

The question then, at issue, is narrowed down to a single point ; in a separate suit at Law, by action of debt, at the instance of a bill-holder against a stockholder, shall the plaintiff be entitled to recover the whole of his bills, if they do not exceed the amount of the defendant's stock, or shall he recover a ratably portion only ; that is, as the stock owned by the defendant bears to the whole capital stock of the bank ?

According to the construction heretofore put by this Court, upon this Act, while it was designed to create a personal liability on the part of the stockholders, it, at the same time, limits that liability.   Had the section under which this suit is brought read, "the persons and property of the stockholders shall be pledged and bound for the ultimate redemption of the bills or notes issued by the bank", the only construction of such a provision could have been, that the stockholders were liable in their natural capacities, as partners, for the whole amount of the unpaid bills or notes, whatever that amount might be.   But the insertion of the intermediate words, that they are to be bound "in proportion to the amount of shares, and value thereof, held by each", curtails the general liability, and prescribes, in the first place, not only personal and several liability—but, secondly, so restricts it that no stockholder can be made responsible, in any event, beyond the proportion which the number of shares held by him, bears to the whole number into which the capital stock of 10,000 shares is divided.

If this, then, be the true meaning of this section, and in my judgment it is all that it proposes to effect, it follows, of course, that the creditor, in his action at Law, *may* recover the *whole* of his debt, and not a *proportion* of it only.   At any rate, this will be regulated by general principles, uncontrolled by the Statute.

The policy of the Legislature in making this provision, which is a condition, in most, if not all the charters granted about this time, was to secure a sound currency to the country : and as one. of the means of accomplishing this object, they intended to give to every bill-holder a simple, direct and available remedy *at Law*, for coercing the stockholders to redeem the circulation of the bank.

Were the words of the Act ambiguous, and its grammatical structure doubtful, such exposition should be given to this section, as would best harmonize with its design.    And every fair and reasonable intendment ought to be made, to effectuate the intention of the makers of the law, *pro bono publico*. (*Heyden's Case*, 3 *Rep.* 7.    *Plewden's Commentaries*, 1057, *b.* *Rex vs. The Eastern Counties Railway Company*, 2 *Q. B. Rep.* 347.    *Williams vs. Pritchard*, 4 *T. R.* 2.    *Lyde vs. Bernard*, *M. & W.* 113.    *Pierce vs. Hopper*, *Str.* 253.    *New River Company vs. Graves*, 2 *Vernon*, 431.)

Indeed, these and numerous other authorities, ancient and modern, which might be cited, go quite beyond the foregoing well settled rule of construction, and maintain that the words of a Statute may be construed in a sense different from their ordinary meaning, when the Act is designed to remedy some existing or threatened mischief.    But I am not, and never have been, the advocate of an enlarged interpretation of Statutes or Constitutions.    In the words of Mr. Justice *Coleridge*, "I would never mould the language, in order to meet either an alleged convenience or an alleged equity"; and, I will add, or an alleged public policy.    And if I felt that the construction which I am endeavoring to uphold, put any force on the meaning of the Act, I should refuse my concurrence, without the clearest and most indisputable evidence of legislative intent.    But when the XIth section of this charter declares that the stockholders shall be bound in proportion, it does not say, to the *number* even, but to the *amount* of shares, and the value thereof, they may severally hold, and that, too, as in common actions of debt, is there any straining of language to insist that they are respectively bound, according to the amount

or extent of their stock, especially if this construction, while it imposes no additional burden upon the stockholder, will greatly add to the security of the creditors of the banks and other corporations, by making their remedy over more cheap and easy ?

What was the case of *Coulter et al. vs. Robertson*, (2 *Cushman*, 278,) that has been commended, so earnestly, to the favorable consideration of this Court ? A trustee of a dissolved bank was appointed by Statute, to sue for and collect money sufficient to pay all the debts of the bank. And what was the result of the judgment of the Mississippi Court, in that case ? Why, that the trustee might select the particular debtors to the corporation, that he would sue first; and that these had to pay, "to the uttermost farthing," what they owed the corporation, while all the rest went free—and this among debtors standing as these stockholders do—precisely upon the same footing. Equality of *burdens* was certainly wholly overlooked or disregarded, in this decision.

But suppose we have been wrong, heretofore, I maintain that the next most consistent and rational construction of which the words of the Act are susceptible, is this: That instead of the aggregate liability of the stockholders being limited to $1.000.000 only, the amount of the capital stock, they are bound for the ultimate redemption of *all* the unpaid bills issued by the bank, be it one million or any other sum. And I confess there is much reason in favor of this interpretation of the charter. It is true that the charter declares, that the stock of the company shall consist of $1.000.000, to be divided in shares of $100 each. But the capital is not expressly limited to that sum. It does not even say, as is usual in monied charters, that the capital shall *not exceed* or *be more* than one million. The convenience of the intended stockholders, as well as notice to the public, required that the amount of the company's funds should be fixed. But in this case, not only is there a departure from the common practice, in this respect, but by another fundamental rule of the corporation, they are allowed to contract debts by bond, bill, note or other security,

to three times the amount of the capital stock actually paid in, over and above the amount of specie actually deposited in the vaults of the bank, for safe keeping.

Suppose that instead of $1.000.000, the unpaid circulation, upon the failure of the bank, had amounted to $3.000.000, may not the Legislature have intended that the stockholders should be personally bound for the eventual payment of the whole of this sum? The corporation was authorized, under certain circumstances, to create this amount of indebtedness; and the presumption is, that it was done for the benefit of the corporators. But whether this be so or not, the liability would have been incurred by the duly appointed agents of the company; and if a total loss ensued, even to the extent of absorbing both profits and capital, ought third persons to suffer?

If this be the true exposition of this individual liability section—the clause under consideration means this—that the stockholders shall be personally and severally responsible for the ultimate redemption of all the unpaid bills and notes of the bank, be the same more or less, at least up to three millions.

But the question recurs, how liable? Still, not as unincorporated persons, but in terms of the charter, in proportion to the amount of shares held by each, and the value thereof, viz: if the circulation to be taken up amount to $200.000, and the defendant, Mr. Harris, owns 100 shares, he is liable for $2.000. If the unredeemed circulation be $1.000.000, he is bound for $10.000: if $3.000.000, for $30.000. This construction makes the measure of each stockholder's interest and right to dividends, the measure, also, of his responsibility. And thus forecloses the question of contribution, as between the stockholders, themselves, because no one of them can be compelled, under any circumstances, to pay more than his proportion of the whole debt. And in this way, all real or apparent hardship is avoided.

I concede that the true constructive effect of this clause is not clear, beyond a doubt. And as I grow in years, at least, if not in wisdom, I have learnt to repose less confidence in my own, as well as in the opinion of others, however *authorita-*

*tively* expressed.   And in this instance, I am not prepared to say, with certainty, that the latter view taken of this charter, though at variance with the opinion heretofore intimated by this Court, may not be a sound one.   Moreover, it has, to my mind, this additional recommendation—that it approximates more nearly to what the law of corporations ought to be, namely: that these artificial bodies, when created, should occupy precisely the same situation, as to the capacity of contracting, as natural persons ; and that just so soon as the stockholders, in their character as corporators, become irresponsible, take away the shield interposed by the Act of incorporation, and leave them liable, in their private capacity, for their contracts, as if no charter had been granted.

That the same individuals should be permitted to repudiate debts which they have contracted as corporators, is contrary to all the inflexible rules of law and justice, as applied to every other business transaction of life.   The Legislature has already, by the Acts of 1843 and 1845, adopted this principle and made it applicable to all corporations, except banks and insurance companies.   (*Cobb's Digest*, 542–3.)   And I am content, therefore, to administer the law as I find it settled by the sages of the science who have gone before me, " whose shoe's latchet I am not worthy to unloose".

Either of the two views which I have undertaken to present of this question, stand equally opposed to the idea of a ratable liability *upon each bill.*   For in the last light in which it has been contemplated, it would only be incumbent on the plaintiff to show that the proportional liability of the defendant, upon his hundred shares, for the outstanding bills, was sufficient to cover his demand; and he would be entitled, as under the first view taken of the Act, to a recovery for the whole amount of his claim.   I thus yield what might, perhaps, admit of debate, to-wit: that the *onus* would be upon the plaintiff, to prove the amount of the unredeemed circulation.   And this he could do by resorting to the books of the bank—its published reports, and by such other testimony as he might have it in his power to procure.

But if there be any thing in the XIth section to warrant the construction put upon it by his Honor, the Circuit Judge, I must say, with undissembled respect for the legal acumen of my learned brother, I have not been able, after the most careful and critical examination, to discover it. Of one thing I am entirely sure—give to the charter this interpretation, and it ceases to afford, not only adequate protection, but any practical, working remedy, whatever, to the thousands of billholders scattered over the State, against the numerous stockholders of this broken and defunct corporation.

It is, indeed and in truth, as was "forcefully" urged in the finished argument of Mr. Nisbet, a practical denial of the benefits of the Statute, and an utter repudiation of the legislative policy. Let this ratable liability doctrine obtain, and these personal and individual liability clauses, which have been introduced into our modern charters, will become a dead letter. To hold that every man who is unfortunately the owner of a five dollar bill of one of these insolvent corporations, shall either sacrifice it at a forced sale of ten cents in the dollar, or some other nominal sum, or institute a hundred suits at law, to get his money, or file his bill, bringing all the bill-holders and all the stockholders before the Court, at a cost of fifty times the amount of his claim, is to contravene and render nugatory this most wise and beneficent policy of the Legislature.

In *Russell et al. vs. The Men dwelling in the County of Devon* (2 *D. & E.* 667) where the question was, whether an action would lie against the inhabitants of a county, for an injury sustained by an individual, in consequence of one of the public bridges being out of repair, Mr. Justice *Ashurst* said, "if separate actions have to be brought against each individual of the county for his proportion of the damages, it is better that the plaintiff should be without remedy"—and so we say here.

But it is said that the mischiefs to be apprehended from this decision of Judge *Starke*, are too highly colored. It is suggested that the stockholders will, in most cases, upon the mere presentation of each bill, promptly pay their respective quotas; and that recourse need not be had to the Courts to compel

Lane *vs.* Harris.

them to account for their share of the debt. I must say, the experience of the past negatives this assumption. And let it be remembered, that any exposition of the charter, based upon this hypothesis, is necessarily fallacious, inasmuch as the XIth section was inserted in the Act, upon the supposition that voluntary payment would be refused. And it provides a remedy by suit, in direct reference to this contingency. The stockholders are to be forced—not coaxed to respond, " in the same manner as in common actions of debt". This clause evidently looks to forcible, and not peaceable redress. It is a war measure.

However the fact may be, therefore, the section must be construed as intended to supply a coercive proceeding—and we must, of course, spell out the meaning and will of the Legislature, in that aspect of the Statute.

But were it otherwise, the inconvenience to the small bill-holders (and nine-tenths are of this description) of seeking satisfaction in this way, even could they succeed, by getting a modicum contributed by each stockholder, on whom they might successively call, would be little less than would be incurred by every bill-holder dragging every stock-holder to Court, to collect out of him his ratable proportion.

It may be contended, that this is the only sort of liability which takes an equitable view of the rights of all the bill-holders, as well as the liability of all the stockholders. That the former have equal rights as creditors, to demand and receive payment of the latter, and that to allow one or more to collect the whole of their money out of one or more of the solvent stockholders, by means whereof a portion of the rest may be entirely excluded, is unjust, and consequently, ought not to be sanctioned. This objection, so far as it in reality exists, arises not from any defect in the law, but from the imperfection of all human institutions. Each stockholder owes to a bill-holder the amount of the value of his shares. It is a statutory debt, *quasi ex contractu.* The bill-holders are in the position of a number of creditors of a common debtor, who is bound only to pay a given amount. They stand primarily equal in their right.

Any one or more may be *bona fide* preferred and paid. And in this case, as in all others of like character, he who is vigilant, and sues and gets judgment, acquires precedence under the law. And this does no wrong to any body. This is a familiar principle, and one which is constantly recognized and enforced in all the Courts. Thus, in *McDermutt vs. Strong*, (4 *John. Ch. Rep.* 691) it was said by the Chancellor, "though it was the favorite policy of the Court to distribute the assets among creditors *pari passu*, yet where a preference had been established by the superior legal diligence of any creditor, that preference should be observed in the distribution".

So in *Corning vs. White*, (2 *Paige* 567) it was held that the filing of a creditor's bill, gave to the vigilant creditor the right to priority; and that there was nothing in the principle of equal distribution among all the creditors, *pro rata*, which has been considered powerful enough to set aside the priority already acquired by a vigilant creditor. *Hubbard et al. vs. Hamilton Bank* (7 *Metcalf's R.* 340.)

Favored as *rent* is in England, a landlord could not there, until the Statute of *Ann*, destrain goods taken under execution, and which were, as it is called, *in custody of the law*. That Act gave him a remedy for one year's rent, but no more. The industrious creditor seized and appropriated the rest. Is not the whole doctrine of the Statute of Limitations founded upon the maxim, *vigilantibus non dormientibus jura subveniunt?* The law regards those who watch, and not those who sleep—the law is only for the protection of those who use diligence to protect themselves. In popular actions to recover penalties, the right to which is given to *all* the people in common, he who brings his suit, and can obtain the first judgment, secures a title, to the exclusion of every body else.

A most striking illustration of this principle is to be found in the law, prescribing the order in which the debts of an insolvent testator or intestate are to be paid, by the executor or administrator. The Statute directs, peremptorily, that the legal representative shall pay first, funeral and other expenses of the last sickness, and so on. Besides, it is well settled that

no creditor, by obtaining judgment, elevates his demand in the scale of priority. And yet, in the face of all this, a creditor of inferior dignity, by suing at law, and obtaining judgment, may exhaust the whole of the assets of the estate, to the exclusion of claims of a superior grade. True, the representative may make himself personally responsible, by not pleading these outstanding debts, provided he have notice of them. But he may be utterly insolvent; and whether this be so or not, the conclusion to be drawn in favor of the doctrine involved in ᴛthis discussion, is equally pertinent. Indeed, in England, the rule is, that among debts of equal degree, the creditor who gets a judgment, is allowed a preference; and the reason assigned is, "because the executor ought to pay that creditor first, who uses the first diligence.". (2 *Wms. Ex'rs*, 258.)

So in *Ashley vs. Pocock*, (3 *Atkins*. 209) Lord *Hardwicke* said, "Suppose two creditors at large of the first testator, Barnsley, and one brings a bill before the other, and obtains a final decree and a report of the master, and that report has been confirmed; and then the other brings a bill, and obtains a final decree, and his demand is affirmed, to be sure the executor ought to have paid the first who used the first diligence. So in case of an action at law, the creditor who obtains the first judgment, should be preferred".

The very motto of the law is, "the race is to the swift." Why the priority given by law to first judgments, first attachments, first deeds, first mortgages, the first entry of public lands—*the first every thing?* The universal response is, *non leges vigilantibus, non dormientibus subveniunt.* Even the miller's rule is, "first come, first served", which is a strong, though homely translation of this fundamental maxim. It was recognized and enforced by this Court, in the case of a Sheriff's bond. *Bothwell vs. Sheffield*, (8 *Ga. Rep.* 569.)

The Sheriff of Dooly County had given his bond, in terms of .the law, in the sum of $5000. It was to indemnify all persons aggrieved by the official misconduct of himself and his deputies. Moneys were collected by them on executions, far exceeding in amount the penalty of the bond, and which they failed to

pay over. Suits were commenced, and others threatened, by the plaintiffs in *fi. fa.* for an amount much larger than the penalty of the bond. And the securities filed their bill, and prayed the Court so to direct the judgments to be recovered, that the creditors first entitled should be satisfied to the extent of their obligation; and that they might be restrained from further prosecuting their suits.

On the demurrer, the Court below dismissed the bill, upon the ground that the complainants had a complete Common Law remedy. And this Court affirmed the judgment, and held that whenever, by previous recovery, the penalty of the Sheriff's bond has been exhausted, the sureties may, even at law, plead this fact and protect themselves from further liability— and this being the case, it would be unjust to more vigilant suitors, who had been injured by the official misconduct of the Sheriff, to restrain them from prosecuting their rights at law.

We say of a case *currit quartuor pedibus*, or that it goes upon all fours, when it is exactly similar in its circumstances to the case in support of which it is quoted, or when it is exactly in point. *Bothwell vs. Sheffield* is all that and more. For in this case, every one of the execution creditors whose money was collected and withheld, was equally entitled to participate in the security, provided by the Sheriff's bond, as was every other person aggrieved by the misconduct of that officer, whether a judgment creditor or not. And yet a Court of Chancery refused to entertain an injunction upon the application of the securities, to restrain the creditors who had first sued, upon the ground, that the liability of the securities was limited by their bond; and that they might protect themselves by a plea to that effect, as well at Law as in Equity. And that this being so, the *vigilantibus* doctrine should not be disturbed.

I have said that this case covers the one at bar, and that it does more; and it is true in this, namely: that the creditors of the Sheriff have but a single fund to which they can look: whereas, in the case before us, every other stockholder besides the ones sued, is also liable to every other bill-holder for the amount of his shares. And unless some of them are bankrupt,

or have left the State, the recoveries, as well as the rights or liabilities would be pretty much equalized. And he may very well imagine that this was in the eye of the Legislature, in providing this remedy—that each bill-holder might look for payment to some stockholder who was in his neighborhood.

Had all the bill-holders severally sued the corporation before its dissolution, would not the first judgments have been first satisfied? And yet all could not have been paid had the corporate property been limited in value. And this. would have been a parallel case to that of the Sheriff's bond, why should a different rule prevail, when proceedings are instituted against the corporators to charge them personally, instead of against the corporation? a rule which is contrary to all the analogies of the law, and in conflict with the maxim and motto to which I have referred; and which are indelibly inscribed over the door-way of every Court-house? It is certainly not for the benefit of the bill-holder, whatever other interest it may subserve.

I am sufficiently conscious that the opinion in *Bothwell and Sheffield* is more than questioned by the decision of Judge STARKE. It is virtually over-ruled, and with it, in effect, though unintentionally, of course, the Act of the General Assembly, passed in 1847, and approved December 30th of that year. (*Cobb* 502.) For, on examination, it will be found that the opinion of this Court is in literal conformity to the provisions of that Act. Indeed, it was based upon it, and was so understood by the author of the New Digest, as will be seen by his marginal reference. And although that Statute was passed for a different purpose, it is nevertheless a plain and palpable legislative recognition of an old Common Law principle.

This Act is directory of the mode of entering up judgment on official or voluntary bonds.

And it not only repeals the rule as laid down by this Court, in *Stephens and others vs. Crawford, Gov.* (3 *Kelly's Rep.* 499) that there can be but one recovery on a bond at Common Law, but it affirms, by clear and irresistible implication, the doctrine that, primarily, all persons injured by the misconduct

of the Sheriff, have an equal right to demand and have indemnity out of his official bond: but that those who sue and obtain the first judgments, are to be first satisfied, until the whole penalty of the bond is exhausted; and that then these previous recoveries may be pleaded in bar of all subsequent suits.

While this *Statute* stands in the Book, it is in vain to talk of the unreasonableness of the *rule* about to be established in these bank cases. Both are in strict accordance with the whole logic of the law; and are, I had almost said, indissolubly interwoven with the whole frame-work and superstructure of the science.

When the inquiry is made then, who is the promisee, under this *quasi* contract, and which bill-holder shall have the preference? shall he who is sharpest and who has outstripped the rest in the race, receive payment, while others who are more modest, though equally, if not more meritorious, are postponed? we answer, should even this result follow, which can hardly be anticipated, " so the law is written".

The State, in permitting a paper currency, has evinced great care to prevent any injury or loss to the people. It has adopted this measure, amongst others, for this purpose. No legislation can absolutely protect the community against the possibility of loss, because no legislation can, as was said by the Court in another case, "make the directors of all the banks equally skilful and prudent—all their officers honest and all their debtors solvent". Still, in construing these Acts, we should steadily keep in sight the end for which they were passed. And in case of doubt, that interpretation should be preferred which, while it saves a multiplicity of suits and consequent accumulation of costs, will, at the same time, afford the best safeguard against the evils of adventurous banking. Acting under proper restrictions, and honestly and faithfully performing the duties assigned them by their charters, these monied institutions will always prove valuable instruments of public utility and convenience. But relax these legislative checks, and the grossest management, not to use any harsher terms, must and will be the natural and inevitable consequence.

Lane *vs.* Harris.

Before quitting this case, I am constrained to say, that upon further reflection, I am not content with the assent which I gave to one point in the judgment; and that is, as to the effect of the return of *nulla bona* made by the Sheriff of Muscogee County, on the execution against the bank or its assignee. It was held to be *prima facie* evidence only, of insolvency, in this action against the stockholder.

I am not satisfied that the return of the Sheriff can be controverted in this suit, especially as the return was made in the county, where the bank was located, and where, it is reasonable to suppose, it had property subject to the *fi. fa.* if any where. No case was adduced to authorize it. *Goodall vs. Stuart,* (2 *Hen. &. Mang.* 105,) is a precedent directly against it. And I find it very difficult to answer, satisfactorily to my own mind, the reasoning upon which that decision was made. Such a practice would be attended with difficulties which would seem to be almost insuperable. Besides, the general principle is indisputable, that a return by the Sheriff is conclusive between the parties, and can be impeached only in an action against the officer, for a false return. It required a special Statute to authorize the *impromptu* answers made by Sheriffs, to rules and orders taken *even against* him, to be traversed. (*Cobb,* 579.)

And suppose it be true, that there are assets belonging to the bank, as the plea alleges, these very assets belong to and are the property of the stockholders, which distinguishes this case from that of principal and security, to which it has been likened. But I forbear to discuss this assignment.

Lane *vs.* Harris.

Benning, J. dissenting.

When this case was called up, Mr. Dougherty, one of the Counsel for the plaintiff, objected to my presiding in it on three grounds—First. That a case or cases like this was pending in the Superior Court of Muscogee County, in favor of the plaintiff in this case, against Mrs. McDougald, as the executrix of Daniel McDoughald, deceased, and that at the time of my being elected a Judge of this Court, I was of Counsel for her in the case or cases.

. Secondly. That cases like this were pending in that Court in favor of other persons than this plaintiff, against Col. Seaborn Jones, as a stockholder in another bank—the Chattahoochee Rail-road & Banking Company, and that Col. Jones was my father-in-law, and had been, at the time of my election as Judge, my client in those cases.

Thirdly. That the Counsel for the defence, in each of the cases commonly called the "bank cases," to which cases belonged this, had agreed, among themselves, to make, or had made "common cause" in the defence of all the bank cases; and so, that all of those Counsel were to be considered as substantially engaged in the defence of each and every one of the cases; that, consequently, I was to be considered as having been, at the time of my election, substantially one of the Counsel for the defendant in this very case.

These grounds I did not think sufficient to support the objection, and therefore, notwithstanding the objection, I presided in the case. Was I right in this? That I was, I will state my reasons for thinking.

First, then, as to the third ground. That ground, as far as it concerns me, has no foundation, in fact. I never made any agreement with any body, to make common cause in the defence of the bank cases, generally, or of this case, in particular. I never took part in the defence of the cases generally, or in the defence of this.

As to the other two grounds, I shall admit them to be sub-

stantially true, although I might say, if I pleased to say it, that Col. Jones, as to all the cases of any consequence against himself, viz: those in favor of the Bank of Columbus, has defences different from any which this defendant, Harris, appears to have, or, as I think can have, and that in my opinion these special defences are, of themselves, for him, sufficient.

I take this to be a true principle of law—that it is the duty of a Judge to preside in all cases in which he has had given him authority to preside. This principle, it seems to me, necessarily results from the relation of principal and agent—that relation in which the State and a Judge stand toward each other. The State delegates to a citizen authority to decide cases. Why? I can conceive of no reason why, except that the State wishes him to decide the cases. As to the purpose of the State, in the delegation of the authority to him, there are but three things that occur to me as supposable—one, that the State wished the authority to be used—one, that the State wished the authority not to be used—one, that the State was indifferent whether the authority should be used or not. To say that the State wished the authority not to be used, is to say that the State is so foolish as to do an act which is not merely superfluous, but an act which can have no result, whatever, except a result which defeats the State's wishes. To say that the State was indifferent whether the authority should be exercised or not, is to say that the State is both so foolish as to do a superfluous act, and is indifferent whether wrongs done by one of her citizens to another shall go unredressed—whether wrongs done to herself shall go unpunished—whether right, public or private, shall be left without a guard : and to say this, is to say that the State has prepared the whole body of her law, both civil and criminal, without an object ; for if the State be indifferent whether her laws be executed or not, what motive can she have had for preparing those laws? To say that the State's purpose was, that the authority should be exercised, remains the only thing supposable.

Now, what is the will of the principal, is the law of the agent;

and the more especially, if the principal be the sovereign, and the agent a subject or citizen. And whatever is the law to a man, he is bound to obey. A Judge being the State's agent, and having had authority given him by the State to preside in certain cases, and thus having been notified of the will of the State, that he should preside in those cases, it follows that he is, *bound* to preside in them—bound to preside in *all* the cases.

It is not for the Judge to elect one sort of case for presiding in, and to reject another. If any thing of that kind is to be done, it is to be done by the State. As to the Judge, the cases all stand upon the same footing.

If, when the Judge has been authorized to sit in all cases, it is not his duty to sit in all, which are to be the excepted ones— and what is to be the ground of exception? Are they to be cases in which, for some reason or other, it would be disagreeable to the Judge for him to preside? If so, whether the Judge shall preside in any case whatever or not, will depend upon the Judge's pleasure. Are they to be cases in which, for some reason or other, it would be disagreeable to the parties, or to any party, for the Judge to preside? If so, whether the Judge shall preside in any case whatever, or not, will depend upon the pleasure of any party in the case. And what cases remain to be the excepted ones, if none of these are to be excepted cases?

But as to the Judges of the Supreme Court, this duty, it seems to me, has been prescribed to them by the Act organizing that Court. That Act, in its third section, says, " It shall be the duty of all the Judges of said Court to attend, at each term; but if, from Providential cause, any one of said Judges cannot attend a Court, such Court may be holden by two Judges." Why is it made the duty of each Judge to attend at every Court? There can be but one answer—that each may sit and take a part in deciding the cases returned to every Court—in deciding one of such cases as much as another, provided that the authority to each Judge to sit in one, is the same as it is to sit in another. When the authority to sit in one case, is the same as it is to sit in another, is not the duty to sit in one, the same as

Lane *vs.* Harris.

it is in another? If the intention was not this, here was the place to say so, and to specify the cases on which it was not to be any Judge's duty to sit. And here is specified one single case, in which a Judge is excused from sitting—and that case is, when he is kept from being in attendance, by Providential cause. No other is specified. And *inclusio unius exclusio alterius.*

Considering it, then, to be true, that it is the duty of a Judge to sit in all cases in which has been given him authority to sit, I proceed to the question—what cases are they in which no authority to sit has been given a Judge? What cases are they which a Judge is disqualified to preside in? These being seen, those which a Judge is qualified to preside in will also be seen.

It is a maxim of the Common Law, that a man cannot be judge in his own cause. "*Aliquis non debet esse judex in propria causa.*" (1 *Coke Litt.* 141 *a.*)

Within this maxim a number of cases have been held to fall, although not cases in which the Judge was a party, viz : cases in which the Judge, though not a party, had an interest. (14 *Vin. Abr.* 574–6.)

Then there have been a number of other cases, in which individual Judges have held themselves disqualified to sit, although they were neither parties in the cases nor interested in them. A Judge has declined to sit on account of "being connected with the parties", (5 *Maule & Sel.* 21,) or "being connected with one of the parties," (5 *Durnford & East,* 5,) or for having, when at the bar, been "Counsel in the cause," (1 *Barn. & Adolph.* 605. 1 *Brod. & Bing.* 161,) or for having been "consulted" in the cause, (6 *Barn. & Cr.* 566. 3 *Barn. & Adolph.* 2,) or for having been "concerned" in the cause, (2 *East.* 272, do. 389, do. 478, do. 520, do. 555, 3 do. 245, do. 393, 2 *Bos. & Pul. New. R.* 451.) There have been cases in which two out of four Judges have declined to give any opinion, "as they had been engaged in the case while at the bar," (5 *Maule & Sel.* 103.) In *Doe ex dem. Early of Jersey vs. Smith,* (5 *Maule & Sel.* 475,) a case of this sort, Lord *Ellenborough* said

"that only two Judges were in a situation to pronounce any judgment, the other two having, when at the bar, been engaged in the case."

The example of these English Judges has been followed by the Judges of this Court. Instances of that are to be found in 1 *Kelly*, 29, 275, 348, 365, 402, 466, 481, 513, 525, 598, 639.

To bring all of these cases within the maxim, that a man shall not be a judge in his own cause, it is necessary, it must be confessed, to read that maxim most liberally, according to its spirit and not to read it according to its letter. But if they cannot be brought within it, they have to stand without justification, for there is no other maxim or law, of which I am aware, within which they may be brought.

Admitting them to be within the maxim, it may be doubted whether the maxim, itself, has not been repealed by the part of the Constitution of the State which provides for the establishment of this Court, and by the Act of the Legislature which establishes the Court.

In the Constitution are these words: "The Supreme Court shall *consist* of *three* Judges", &c. "And the said *Court* shall, at each session in each district, dispose of and finally determine *each and every* case on the docket of such Court, at the first term", &c.

The expression "each and every case", is broad enough to include all cases of the kinds above enumerated. And all cases which it includes, the *Court* is required to determine; and the Court is declared to be a something which shall consist of *three* Judges; and is it not clear that what consists of but two Judges does not consist of enough to constitute that something? Did not the Constitution intend that it should take all three of the Judges to make a Court? If it did, then, when it required the Court to determine "each and every case" on its docket, it required each of the three Judges to sit in each and every such case; for the sitting of each Judge is essential to the making of the Court, and so is essential to a determination of any case by the Court. In short, if the Constitution intended it

to take all three of the Judges to make a Court, then when it said the Court should determine "each and every case" on its docket, did it not repeal the maxim, a man ought not to be a judge in his own cause? The notion that this part of the Constitution intended it to take all three of the Judges to constitute a Court, derives support from other parts of the Constitution.

The third section of the first article has these words:— "The Senate shall be elected biennially" "and shall *consist* of forty-seven members," &c.

The seventh, these: "The House of Representatives shall be *composed* of one hundred and thirty members," &c.

The twelfth, these: "a *majority* of each branch shall be authorized to proceed to business, but a smaller number may adjourn from day to day, and compel the attendance of their members in such manner as each House shall prescribe".

In the old Constitution, that of 1777, are to be found provisions similar to these, and also a provision in these words: "All causes" "shall be tried in the Supreme Court", "which Court shall *consist* of the Chief Justice and three or more of the Justices residing in the county. In case of the *absence* of the Chief Justice, the senior Justice on the bench shall act as Chief Justice", &c.

This language in the third and seventh sections, which the Constitution applies to both branches of the Legislative department, is the same, or the same in substance, as that in another section, which we have seen it to apply to as much of the Judicial department as is constituted by the Supreme Court. The Supreme Court shall *consist* of *three* Judges". The language, therefore, it is to be presumed, was applied to the Supreme Court in the same sense in which it had been applied to the two branches of the Legislative department. But as to those branches, is it not clear that the Constitution considered the language as saying, that to make a senate, it should take full forty-seven members; to make a House of Representatives, full one hundred and forty; for if the Constitution did not consider the language to say this, what reason had it for inserting the provision contained in the twelfth section. The provision that

" a *majority* of each branch shall be authorized to proceed to business"?

Now this provision in the twelfth section, is confined to the two branches of the Legislature. It is not extended to the Supreme Court. It is not said of the Supreme Court that a majority of its members shall be authorized to proceed to business. And *inclusio unius exclusio alterius.*

Indeed, an argument of the same sort is to be drawn from the sixth section of the third article which concerns the Inferior Court, in which it is said, " the Inferior *Court* shall have power to vest the care of the records and other proceedings therein, in the Clerk; or such other person as they may appoint, and any *one* or *more Justices* of the said Court, with such Clerk or other person, may issue citations and grant temporary letters", &c.

The Act of the Legislature for organizing the Court is, in this particular, stronger in some respects, perhaps, than the Constitution. It uses this language : " the said Court shall consist of three Judges," &c.  " It shall be the duty of all the Judges of said Court to attend at each term of said Court : but if, from Providential cause, any one of said Judges cannot attend a Court, such Court may be holden by two Judges.  If only one Judge shall attend a Court, it shall be his duty to open the Court, and to adjourn it to a day not more than two days beyond the regular term, at which time, if two Judges do not attend, the Court shall, in that case, be adjourned to the next regular term." (*Sec.* 3.) " The Supreme Court shall proceed, at the first term, (unless prevented by Providential cause) to hear and determine each and every cause which may, in manner aforesaid, be sent up," &c.

"If, from *Providential* cause, any one of said Judges cannot attend a Court, such Court may be holden by *two* Judges."  Is not the implication this : that if the cause which keeps a Judge absent be Providential, then the other two Judges *may* hold the Court : but if the cause be any thing else than Providential, then the other two may *not* hold it.  If so, again *inclusio unius exclusio alterius.*

Lane *vs.* Harris.

And if the idea was that a majority of the Judges might, in general, be sufficient to make a Court, it may be asked why was imposed upon each Judge the duty in terms so peremptory, " to attend at *each* term." Why was not attendance left to the discretion of each Judge—to the sense which each might entertain of his own duty, in the same manner as the attendance of members of the Legislature is left to each member's sense of his duty?

In other respects, the Act is like the Constitution—like that, it requires the Court " to hear and determine *each* and *every cause* which may be sent up" to the Court.

All these things taken together, not to mention the rules of the general law, as to the strict construction of naked powers, and as to the manner of executing powers delegated to more persons than one, I think there is enough to make it most doubtful whether both of the following propositions are not true : First. That it takes *all three* of the Judges of the Supreme Court to make that Court, on all occasions, except those on which Providential cause prevents one of the Judges from sitting. Secondly. That the Court, thus made, has to hear and determine *each and every* case before it.

If it be assumed that both of these propositions are true, then it follows that the rule, a man ought not to be a judge in his own cause, is repealed, unless the words " each and every case" be restricted in their meaning.

Let it be assumed, that these words are not to be restricted in their meaning, and that with these words, in their unrestricted meaning, the propositions are true.

This assumed, let us apply the propositions to a possible case, and see how they will work.

Suppose the case before the Supreme Court to be a case in which one of the Judges of that Court is an actual party—say the defendant in error. What would be the effect of these propositions, if true, on such a case ? This: First. All three of the Judges would have to sit in the case. Secondly. There would be a *chance* for reversing the judgment. Two of the three Judges would be disinterested, and they, if the other dis-

sented, could render the judgment of the Court. The other might, himself, after hearing argument, come to concur with his associates. It is at least certain, that there would be a *chance* for the judgment to be reversed—a better chance than there would be if all three of the Judges were the defendants in error. And there is Common Law authority to the effect, that when all of the Judges of a Court are parties defendants in a case, they must nevertheless sit in the case "for necessity." (14 *Vin. Abr.* "*Judges*" (*A.*) 7 *Grant on Corporations*, 281.) It does not, it seems, take all of the Judges of the King's Bench or Common Pleas, to make a Court. And so, if only one of the Judges of those Courts is interested in a case, his fellow Judges may decide it.

The effect, then, of these propositions, if true, upon the case supposed, would be to give the plaintiff in error, the party opposed to the Judge, a *chance* for a judgment in his favor—a chance for a reversal.

Suppose, now, the plaintiff in error to object that the Judge, who happens to be the party defendant in error, ought not to sit; and that that Judge yields to the objection, what is the effect of that? It amounts to an affirmance of the judgment below. The effect is to make the Judge certainly gain the case, and the objecting plaintiff, his adversary, certainly lose it.

Now, the only difference between this supposed case and the real case is, that in the real case, the Judge, against whose sitting the objection was made, was not at all a party in the case. He was only of Counsel in a like case—only the connexion of a party in a like case.

But suppose the words, " each and every case" in the latter of the two propositions, are to be restricted in their meaning— restricted to such cases as by the law existing at the time when those words were used by the Constitution and the Statute, it was lawful for a Judge to preside in, viz: cases in which he was not a party and so forth, then what would be the effect of the propositions upon the case supposed? The certain affirmance of the judgment of the Court below. One of the Judges would be the defendant in error. He could not sit. The other two

would not be sufficient to make a Court—and without a Court, no judgment, of any sort, could be rendered in the case ; and therefore, the judgment of the Court below would have to stand good—that is to say, the effect of the law's not allowing the Judge to sit in his own case, would be to make him gain it to a certainty.   This being the law, whether sitting or not sitting would be to the interest of the Judge, would depend simply upon whether he was plaintiff in error or defendant in error.

The difference between this supposed case and the real case has been above stated.   The effect of yielding to the objection, that the Judge ought not to preside in the real case would, these propositions, in this restricted sense of the words, " each and every case", considered as true, have been to make the party objecting certainly lose his case.   The effect of not yielding to the objection, was to give him a chance to gain it —a chance which, as it happened, resulted in success.

Now I have not said that I consider to be true, both or either of these propositions, viz : first, that it takes all three of the Judges of the Supreme Court to make a Court, on all occasions, except those on which one Judge is, by Providential cause, kept from sitting.   Secondly, that the Court, thus made up of all three Judges, must determine " each and every case" before it.   What I say is, that it is very doubtful to my mind whether they are not true.

If true, and the words, " each and every case" in the second, are to have their literal meaning, then I think it clear that the law expressed by the propositions, repeals the maxim, that a person ought not to be a judge in his own cause.

If true, and these words are not to have their literal meaning, but are to have a meaning restricted to cases in which, by law, it was lawful for Judges to preside, viz : cases in which they were not parties or the relations of parties, or in which they had not been of Counsel before they became Judges, then the law expressed by the proposition does not repeal that maxim; but it is capable of producing, in some cases, an effect which it was the object of that maxim to prevent from being produced

in any case—the effect to make it *certain*, that if the case be that of a Judge who is defendant in error, his *not* sitting will amount to the gaining of his case.

The questions involved in these propositions have never, as far as I know, received any consideration from the Supreme Court. The Judges of the Court, however, have, from the beginning, acted upon the notion that two Judges could make a Court and render a judgment, not only in cases in which the cause that kept the other Judge from sitting with those two was Providential, but also in cases in which the cause was other than Providential, as in cases in which the Judge was a relation of one of the parties, or had been of Counsel for one of them.

It has frequently happened that one Judge has declined to sit in a case for one of the reasons aforesaid, and the other two have rendered a judgment in the case. The example thus set by the other Judges, I have felt myself, not without some difficulty, at liberty silently to follow. The practice, as far as I know, has not been complained of by those on whom it has had direct operation—the parties in such cases, or by any others—still, I must say that I have never yet made up my mind, as to whether a judgment pronounced by two only of the Judges of that Court, in a case in which the third did not sit—did not sit for some reason that was not Providential, was valid.

Admit, therefore, that the old maxim—a man cannot be a judge in his own case, has not been repealed or at all affected by the parts of the Constitution, and of the Statute organizing the Supreme Court, to which I have referred, yet, it is certainly true that by those parts, the maxim has not been enlarged. It is certainly true, that no reason can be found in those parts of the Constitution and of the Statute, to multiply the *variety* of cases to be subjected to that maxim.

This maxim, then, being to be taken as in force, to its full extent, what is that extent? It is what we have already seen. The extent is to disqualify a Judge from sitting in all cases in

which he is a party or the relation of a party ; or in which he has been concerned as Counsel, and in no others.    The maxim does not extend to a case which may happen to be *like* some ·case in which one of the parties may be the Judge's relation, or be a person who was the Judge's client, when the Judge became Judge.    Not a case—not a dictum—not an instance—not an opinion of any law writer or other was cited, to show that the maxim does.    Not a thing of the sort, as far as I know or believe, exists.    To make the maxim go this length, it would have to be read as saying that a person should not sit as Judge in any case in which was involved a question which was also involved in another existing case, whether in suit or not, which might possibly, some time or other, come before him to be adjudged, or might not, in which he or some relation of his was a party, or in which he who was a party, was one for whom the person, before he became Judge, had been of Counsel.    And to read it as saying this, would be to read it as disqualifying a man to sit as Judge in cases of the following kinds :

Say the Judge is a stockholder in a bank or in a rail-road, or has a relation that is one ; or at the time of his election as Judge, was Attorney for the bank or the rail-road, or for some stockholder in either.    The case is against another bank, or rail-road, or stockholder, in one or the other, and is such as to· involve the question, whether a bank, as the indorser of a bill of exchange, is liable, on notice of dishonor given to the president or to the cashier, or to the teller, or to a director ; or liable without any notice at all ; or liable if the indorsement is not made by signature and counter-signature of president and ·cashier ; or liable if the indorsement is not directly and expressly authorized by the board of directors, &c. &c.

Or such as to involve the question, whether the rail-road is ·liable, as a common carrier, &c. &c.

Or such as to involve any question, as to whether either the bank or rail-road is liable, under the *general* law applicable to corporations.

Or such as to involve the question, whether a failure to do ·something required to be done by some provision which is com--

mon to all bank charters and rail-road charters, does not amount to a forfeiture, or to cause for a forfeiture of the charter.

Or such as to involve the question, whether the Legislature has not power to repeal a charter.

Or in short, say the case is such as to involve any of the thousand possible questions which are common to all banks and all rail-roads, and all stockholders in either.

Or say that the Judge happens to be a landholder, by grant, from the State, or is a relation to a person that is such landholder, or was, when elected Judge, Counsel for a man whose case turned on the validity of a grant from the State for land, and the case before him is that of some other man, which involves the question, whether the Legislature can annul a grant or make a young grant take precedence over an old ; or whether a grant carries with it mines and minerals, or any of the possible questions which are common to all grants.

Or say the case is one which involves the question, whether one of the parties to it is bound to pay the poll-tax imposed by the general tax law on all persons, the Judge included, he insisting that the Legislature has no power to pass such a law.

In this case—in all these cases, and in others indefinitely numerous, of similar character, this reading of the maxim makes it illegal for the Judge to sit.

The result of such a reading would be, or come near to being, to make the cases in which a Judge is disqualified to sit, as numerous as those in which he is qualified to sit. And such a result I know of nothing sufficient to bring about, except a law made by the law-making power—a law sufficiently enlarging the maxim, a person ought not to be a judge in his own cause, to bring it about.

The case in which this objection to my sitting was made, is, in some respects, a peculiar one. On one side of it the party is the holder of bank bills ; is therefore one of a class, which, for all practical purposes, may be said to include in it all the people of the State, not even excepting the Judge objected to, for every man holds, or expects to hold, the bills of some bank ; and so, has an interest in preserving a sound bank-bill cur-

rency. The bills of which this party, thus belonging to this powerful class, is the holder, are the bills of a broken bank—of of a bank which, perhaps, a great majority of that class may have come to believe or suspect to have been broken by its stockholders, on purpose to defraud them—of a bank, the bankruptcy of which, unless those stockholders should be compelled, individually, to make good the bankruptcy, that whole class may consider calculated to have, as an example, a bad effect on all the other banks of the State—those other banks whose bills constitute almost the entire money of the class. On one side of the case, such is the party; on the other, the party is one of the stockholders in that broken bank. The Judge objected to, has, for father-in-law, one who is sued as a stockholder in another broken bank, in a suit similar to that against this stockholder, in this broken bank.

Question—which party to this case, is it most to the Judge's interest to decide in favor of? If he decides against the billholder, and can get one or both of the other two Judges to go with him, it is possible that the decision may, in the long run, work to the benefit of his father-in-law, by having some influence, in fact, on the decision of the case against him. If he decides against the bill-holder, but cannot get either of the other two Judges to go with him, it is not possible for his decision to work at all to the benefit of his father-in-law, because a dissenting decision or judgment counts for nothing.

From this is to be seen the degree of interest which the Judge has to decide *against* the bill-holder.

If he decides in *favor* of the bill-holder, it is possible, perhaps not improbable, that he shall please nearly every man in the State, as every man is the holder of the bill of some bank, or is continually expecting to be; if, in so deciding, he puts in possible peril one who is as near to him as father-in-law, and also one or more who were as near to him as clients, it is possible—is it not probable—that he shall give nearly every man in the State exalted pleasure—fill him with a proud rapture at the idea of having to preside over him, a Judge of such magnanimity—such purity—such love of justice.

If, therefore, he thus decides, he stands a good chance, not only to retain all of his old popularity, but to add to the old much that is new. Is popularity worth any thing to him? is it prized by him? He wished to be a Judge—popularity made him a Judge. Does he wish to be made Judge again, or to be made any other dignitary? It is only popularity that can gratify his wish.

Behold what the Judge stands a chance to *gain* by deciding in *favor* of the bill-holder.

By deciding *against* the bill-holder, may the Judge *lose* any thing? The Judge, by deciding against any bill-holder at all, risks offending the whole, or nearly the whole of his fellow bill-holders—a class co-extensive with the people of the State—by deciding against one, when it is possible that such, the Judge's decision, may operate to the benefit of a person who stands to the Judge as father-in-law—of another who stands to him as a former client—the Judge risks not only offending this proportion so large—of this class so extensive—he also risks inspiring it with the horrible suspicion that he is a corrupt Judge. The Judge risks more than his popularity.

See, then, what the Judge, by deciding *against* the bill-holder may *lose.*

A dissenting decision against the bill-holder—a thing that counts for nought—has not the Judge every thing to lose—nothing to gain by making that? If yet he will sit and make such a dissenting decision, does it not seem certain that he is actuated, in his conduct, by some motive stronger than that of personal loss or gain? Does it seem impossible that that motive can be a sense of duty?

The only reason given in support of the objection to the Judge's sitting in this case was, that the decision of the case would be, in law, a decision of the other cases. It was said that this case would be a precedent for those, and that Courts are bound by precedents.

This is a mistake. Courts are bound by nothing but law, and nothing is law but something that is made law by the law-making power. Courts are not this power. They are express-

ly forbidden, by the Constitution, to exercise this power. " The Legislative, Executive and Judicial departments of Government shall be distinct, and each department shall be confided to a separate body of magistracy; and no person or collection of persons, being of one of those departments, shall exercise any power properly attached to either of the others, except in the instances herein expressly permitted". (*I. Sec.* 1 *Art.*)

In a case between A and B, say as to what is lawful interest for money. The Court decides it to be ten *per cent.* Are all future Courts, in all future cases, to say it is ten per cent. ? or are they to go by the word of the law-making power, which says such interest is seven per cent. ? In the case supposed, however, say the decision is, that the interest is seven per cent. Are future Courts, when they too say seven per cent. to be considered as saying so because of that decision, or because of that law on which that decision rests?

What, then, is a decision worth ? It is, to the parties to it, worth all that a law would be worth. To the parties to it, a decision may, indeed, without any great departure from propriety of language, be said to be a law. To A and B, the parties to it, the decision is a law—to the rest of the alphabet it is none. Are previous decisions, then, worth nothing, to operate on future decisions ? Decisions are evidence to show the opinion which the Judges making them have, as to what the law is on the question decided. They are evidence of opinion, and they are worth what opinion is worth. What opinion is worth, depends upon many things. It is worth nothing, when it stands on one side, and law stands on the other. When it is doubtful on which side the law stands; then Judicial opinion, as to the side on which the law stands, if it be of good quality, and especially if it be also of good quantity, is worth much. But in no case does it *govern*—in no case is it *law.* The respect which is paid to it, is paid voluntarily. The Courts, if they choose to depart from it, and go by their own original opinion of what the law is, always do so. And what respect is it likely that Courts would voluntarily pay to a decision made by a Court, one of the members of which was, say a party to the decision ?

And what if the Legislature were to come in, and by a declaratory Statute, say that the law was not such as the decision made it out to be, but was so and so; and that the decision was not to count as any evidence of what the law was?

· Be the influence of precedents, however, what it may, there is no law which says a Judge is disqualified to sit in a case, the decision in which may chance to be claimed as a precedent in some other case in which he or some connection of his, or some person whom he was Counsel for at the time when he became Judge, may be a party. And there is a law, as I think I have shown, that he must sit in all cases in which he has been authorized to sit.

· Upon the whole, my conclusion was—First. That it is a Judge's duty to sit in every case in which authority to sit has been given him. Second. That authority had been given me to sit in this case.

So, considering it to be my duty to sit in the case, in it I sat. I was not aware of any right in me to make the case stand on a footing different from that on which other like cases stand—of any right in me to have one rule for one case, another rule for a fellow case.

· I may remark that this, my opinion, of what law and duty is on the point in question was known—well known to the Legislature which made me Judge.

· In this case, the plaintiff in error, by his Counsel, insisted that the following proposition is true: "our proposition is, that plaintiff is entitled to recover the whole amount of his bills out of the defendant, if the number of his shares and the value thereof is equal to the amount of his bills; and that a recovery against the defendant, is a good plea, in bar to any and all actions brought against him by bill-holders, except as to costs". I quote from the printed argument of one of the Counsel— Judge Nisbet.

· By the words "*value* thereof," the Counsel mean the value of the shares got by considering the *shares as each worth one hundred dollars.* They say, "we admit, as stated by this Court, that the liability of the defendant is *proportional.* He

is bound to pay his proportion of the indebtedness, and that proportion is fixed by the charter.   It is an amount equal to the number of his shares at the value of $100 per share".   I againe quote from Judge Nisbet's printed argument.

By the words, "a recovery against the defendant, is a good plea in bar to any and all actions brought against him by bill-holders, except as to costs," they, the Counsel, mean not only that such a *recovery* is such a good plea in bar, but that a *voluntary payment* of the bills made by the stockholder, is equally such good plea in bar.   They mean that the stockholder will be as much protected, if he voluntarily takes up bills, as if he is forced, by suit at law, to take them up.   They say, "if we are right in our positions, that the defendant is our debtor to the full amount of his liability, and that we have the right to demand and have it of him, then it follows, as an inevitable legal inference, that he cannot be compelled to pay it to any body else.   Satisfaction to us is a defence to him against the world.   According to naked principles of justice, as well as the settled rules of the law, a man cannot be compelled to pay to any body, a debt which he has paid to the rightful creditor, or for which, to him, he has become personally charged".   " They (the bill-holders) are in the position of a number of creditors of a common debtor, who is able to pay only a given amount.

They stand primarily equal in their right, but he who is *bona fide* preferred and paid, may receive payment without wrong to any body.   And he who is vigilant and sues and gets judgment as in all other cases, acquires a preference under the law".

The *extent* of a stockholder's liability is a sum equal to the value of his stock, *rating his stock as worth one hundred dollars a share;* the *manner by which the liability may be discharged,* is by the stockholder's *taking up bills to an amount equal to the value of his stock, rating his stock as worth* $100 *a share, or by his coming under obligation, by judgment or otherwise, to take up bills to that amount.*   This is what the Counsel mean by their proposition, as I understand them.

And that proposition, in this sense, if I mistake not, was,

by a majority of this Court, approved and made the ground for over-ruling the decision of the Court below. I could not approve the proposition. Therefore, I could not agree to make it a ground of over-ruling that decision. Whether the proposition be true or not, depends upon what is the meaning of the eleventh section of the charter of the Planter's & Mechanic's Bank of Columbus. That section is in these words: "The persons and property of the stockholders shall be pledged and held bound, in proportion to the amount of shares and the value thereof, that each individual or company may hold in said bank, for the ultimate redemption of the bills or notes issued by said bank, in the same manner as in common actions of debt; and no stockholder shall be relieved from such liability by sale of his stock, until he shall have caused to have been given sixty day's notice in some public gazette of this State".

What is the meaning of these words? It is, in my opinion, such as not only not to support, but such as to oppose the proposition; and that in every important respect.

As I think these words do not mean to say, that in a valuation of the shares of stock for any purpose, the shares are to be considered worth the fixed sum of one hundred dollars each; regardless of whether as much as $100 a share has been paid the bank on them or not—or mean to say, that in all cases when the stockholder has taken up or become bound by judgment to take up bills, to an amount equal to the value of his stock, he is, as a matter of course, discharged from all liability to take up other outstanding bills—or mean to say, that the quantity of any stockholder's property, liable to the ultimate redemption of bills, is to be a quantity equal to the value of his stock, let the value be rated as it may.

For thus thinking, I will now give my reasons; and then I will state what I think to be the true meaning of the words, and my reasons for so thinking.

First, then. Is the *value* of each share meant by these words, a fixed sum of $100, or is it a sum equal to the sum which may have been paid in on the share, or is it something else"?

How is this question to be determined?

1. By an appeal, in the first instance, to the very "words" themselves.

2. If the words fail to give a clear meaning, then and not till then, by an appeal to the "context"; that is, to Legislation *in pari materia*.

3. If the context fails to give a clear meaning, then and not till then, to the "subject matter".

4. If this fails, then to the effects and consequences.

5. Or, to that which perhaps includes the effects and consequences—the "spirit and reason" of the words.

For these answers to the question how?  I go no further than to *Blackstone*.  (1 *Black. Com.* 60.)

Let us then appeal, first, to the *words*.  The words are, "in proportion to the amount of shares and *the value thereof*". There is nothing in these bare words, from which it can be argued that the meaning is that the "value" is to be considered as of *any* fixed sum.  These words certainly are plainly, not *per se*, equivalent to these, "in proportion to the amount of shares and the value thereof, *rating the value* thereof *at* $100 *a share*".

The only meaning, as it seems to me, which is to be drawn from these words thus taken by themselves is this—in proportion to the amount of shares and the value thereof, rated at what the shares sell for *in market*.  When men speak of the value of a horse, a piece of land, State stocks, stocks generally, they mean the value of each thing, estimated according to what it will fetch, when exposed to sale in open market.

When the Legislature and the stockholders in this bank used the word value, in connection with the stock of the bank, is it to be said that they used the word in a sense different from that in which all men use the word on similar occasions?  If it is, then, it must be, for some reason, outside of the mere words.

The meaning to be drawn from the *naked words* is, that the value of the stock is to be estimated at the *market value*.

What says the "context"?  Does the context say the value of the shares is to be estimated at $100 each share?  The second section of the charter declares that "The stock of the

company shall consist of one million of dollars, in shares of one hundred dollars each, and the stockholders in said bank are hereby rexuired to pay twenty-five per cent. on the amount of their capital stock, in specie, before the board of directors shall be permitted to issue their bank notes, and the remainder of their subscription in such sums, and at such times, as the board of directors of said bank shall require." Does this declaration mean that the shares are to be considered to be of the *value* of one hundred dollars each, as soon as subscribed, whether any thing may have been paid upon them or not? Does it mean that subscribed shares are to be considered of *equal value* with paid-up shares? If so, why does it require, as a *prerequisite to organization—to corporate existence*—that so large a per cent. of the subscribed shares shall be paid up in specie? Why does it not allow the banking to begin upon the basis of the mere subscriptions? If so, why was it said in the fourth rule, that " The total amount of debts which the said corporation may, at any time owe, whether by bond, bill, note or other security, shall not exceed three times the amount of their capital stock actually paid in, over and above the amount of specie actually deposited in the vaults for safe-keeping? Why was it not rather said that the total amount of debts shall not exceed three times the amount of the stock *subscribed*, over and above the specie in deposit?

It seems to me plain that the declaration in this second section, means that a *subscription* of a million of dollars in stock, is *not* to be considered of the value of $1,000,000, until a $1,000,000 have been paid upon it. The declaration seems to me plainly to mean, that a subscription of a million of dollars is to be considered of *no value whatever*, until 25 per cent. of it has been paid; and that after that per cent. has been paid, it is to be considered, as to all banking purposes, of no more value than the value of that per cent. thus paid upon it.

The directors have power to call for payment of the remainder of the subscriptions? True, but this being a power to be used at the will of the directors, and the directors being the creatures of the stockholders, payment may never be called

for. And if ever called for, the call may remain unanswered, either by reason of inability, or indisposition on the part of the stockholder to comply with it; and if of indisposition, the consequence may be merely a forfeiture to the bank of the stock subscribed. The *existence* of this power, it was plainly intended, should not add a cent. to the value of the basis on which the bank was allowed to do business, viz: to the value of the capital actually paid in, *plus* the deposits in specie.

Thus far, then, there is nothing in the "context" to affect the meaning which we had got from the "words", viz: that the value of the shares is to be taken to be what is their market value.

There is other legislation in *pari materia,* as the *Tax Act of* 1817.

This act declares that "there shall be annually paid to the State, a tax of thirty-one and a quarter cents on every hundred dollar's value of bank stock operated upon or employed within this State, which tax shall be assessed and collected in the manner following, viz : It shall be the duty of the president and directors of every bank incorporated by the Legislature of this State, to cause the cashier thereof to transmit to the Treasurer of the State, annually, a return sworn to by him before some Justice of the Inferior Court or of the Peace, in which shall be stated the amount of capital stock annually paid in on the first day of January preceding the time of making such return, and on or before the first day of December in each year, cause to be paid into the Treasury, free of any cost or deduction whatever, the said sum of thirty one and a quarter cents on every hundred dollars of capital stock returned in manner aforesaid." This Act was made to extend to banks established as well after as before its passage. (*Pr. Dig.* 859.)

The principle of stock valuation contained in this Act, is recognized, and more vigorously applied in the Act of 1845, "to compel the banks of this State to pay a tax on the highest amount of bank stock" thereafter " returned by them as subject to taxation." (*Cobb Dig.* 1077.)

This principle is the one which, by other tax Acts, is used

for assessing the value of stock in corporations of other kinds, as by the Act of 1820, for assessing the value of the stock in the Steamboat Company of Georgia. (*Prince Dig.* 1079.)—by the Act of 1850 "supplementary to the general tax laws", for assessing the value of the stock of the Macon & Western Rail-road—by the Act of 1850, to collect a tax for 1850 and 1851, for assessing the value of the stock in the Memphis Branch Rail-road.

The taxation of the stock of the Central Rail-road and the Georgia Rail-road, is regulated by the respective charters of those corporations. By those charters, the tax has to be one on net income.

The Act of 1817 was in operation at the time when the Act incorporating the Planter's and Mechanic's Bank was passed. By the terms of the Act extending it to banks to be established after the date of it, the Act applies to that bank. For one great purpose, that of taxation, the Act absolutely prescribes what shall be considered to be the *value* of the stock of the bank ; and that is, " the amount of the capital stock *actually paid in*." This it is, that is to be considered the value of the stock, for the great purpose of the taxation of the stock.

Other acts prescribe a similar rule of valuation for stock, in the case of corporations of other kinds—of the great internal improvement kinds.

From all this, is it not to be inferred that the Legislature considered the general principle for assessing the value of all corporation stocks, in cases in which they were to be assessed at all, to be the amount of money actually paid in on the stocks ? I think it is. When the Legislature has fixed the value of a thing at so and so, for one great and general purpose, and afterward, in connection with another not very dissimilar purpose, speaks of the value of the thing, in my opinion, it has in mind that same value which it had before fixed, for the thing.

But, at least, did not the stockholders, when they accepted the charter, have ground from this Act, for insisting that they accepted it in the sense that the value of their stock was to be rated ; no higher, in estimating their liability to pay the debts

of the bank, than in estimating their corporate liability to pay taxes; no higher in estimating their liability to pay one sort of debt to the public, than in estimating their liability to pay another sort of debt to the public?

The result, then, of the appeal to *these* Statutes *in pari materia* is, that the meaning of the words "value thereof" aforesaid, in the charter, is not the *market* value of the shares, as the words naturally import, but a value equal to the amount of money actually *paid in* on the shares.

It may, however, be said, that as a general thing, this value and the market value will not greatly differ.

This result is one not to be affected by any thing, of which I am aware, in the "subject-matter"—the "spirit and reason" of the charter, or "in effects and consequences".

But say that I am wrong in this conclusion, and that in finding the liability of the stockholder, the stock *is* to be estimated as of the value of $100 a share; then I cannot agree with the majority of the Court, that this liability is one which may be discharged by the stockholder's taking up bills to an amount equal to the amount of his stock, or by his becoming bound, by judgment, to take up bills to that amount, wholly regardless of the question, whether or not there may not be other outstanding bills, wishing to be taken up.

Supposing now, for argument's sake, that the true mode for finding the amount of a stockholder's property, which is liable for the ultimate redemption of the bills of the bank, is to measure the value of his stock and to take an amount of his property equal to that value, then I say that in my opinion, this amount of property, whatever it may be when found, is to be divided out among *all* the bills needing "ultimate" redemption, and giving notice of their existence to the stockholder; and that if he, after getting such notice, applies the whole amount of the property to the payment of some of the bills to the exclusion of the others, he does *not*, thereby, become discharged from those others.

In such a case, (assuming that the charter, itself, fixes no ratio of distribution,) I think that the law requires the fund or

property to be divided out among all' the bill-holders, claimants upon it, in proportion to the respective amounts of their bills; and that if the stockholder does not see to it, that the property is so divided out, he renders himself liable to such bill-holders as do not get their proportionate share, to make good to them that share out of his other property.

This opinion is founded upon the words of the charter, and upon a vast body of law in *pari materia.*

The words of the charter that I rely upon, are these: "the persons *and property* of the stockholders shall be pledged and held bound" "for the ultimate redemption of *the bills or notes* issued by said bank". I understand by the words, "the bills or notes", *all* the bills or notes. If I am right, then, by the words of the charter, the property of the stockholder is pledged and bound to the ultimate redemption of *each and every bill* issued by the bank. Every bill or note, therefore, has a right to a share in this property. How, then, can the stockholder justify himself for taking the whole property, thus belonging, in shares, to all, and giving it to one? or which is the same thing, justify himself for letting so large a judgment go against him, in favor of one bill-holder, as shall force from him all the property thus belonging, equally, to the other bill-holders?

But if the charter were silent, the vast quantity of law in *pari materia,* speaks a language that leaves me, as I think, no alternative but to adopt the opinion which I have above expressed. In every case in the law, which I can think of, in which a fund is to be distributed among different claimants upon it, the rule of distribution is the *pro rata* rule—the rule which gives to *each claimant* a share—a share proportioned to the amount of his claim.

This, by Statute, is the rule in the distribution among creditors, of the assets of a dead man; this, by Statute, is the rule by which a debtor's property is to be divided among his judgment creditors, whose judgments are of equal date; this, by Statute, is the rule by which the money of a debtor, in the hands of Sheriffs, &c. is to be divided among the debtor's judgment creditors, whose judgments are of the same date,

even though the money be brought in exclusively by some " vigilant" creditor, as by some garnishing creditor; this, by Statute, is the rule by which the effects of insolvents are to be divided among their creditors; this, by Statute, is the rule prescribed to a debtor " unable to pay his or her debts", who wishes to make an assignment of his property to his creditors; this, by Statute—by the Penal Code—is the rule prescribed to banks which, " in contemplation of insolvency", wish to make assignments of their property for the benefit of their creditors and stockholders, under penalty to the president, directors, &c. of imprisonment in the penitentiary for disobedience; this, by Statute—a Statute covering the whole ground of banking—the Statute to authorize the business of banking and to regulate the same, passed in 1838, is the rule by which judgment creditors of the banks established under the Act, are to enforce their judgments against the property of the stockholders in those banks; this, by Statute, is the rule by which the assets of this very Planter's & Mechanic's Bank, ordered by the State into the hands of a receiver, are to be divided among the bill-holders of the bank—this bill-holder, Lane, inclusive, of course; this, by the principles of Equity, is the rule by which Courts of Equity regulate the abatement of legacies— the apportionment of the payments to be made by the different purchasers of property which is encumbered—the marshalling and distribution of equitable assets. (*Pr. Dig.* 228, 435, 451, 287, 293, 164, 37, 633. *Pamph.* 1838, *p.* 39. *Cobb's Dig.* 118, 119, 120. *Story's Eq. Jur.* s. 60, *f.*)

The idea, then, that a stockholder may, as to his individual property, liable to the ultimate redemption of the bills of the bank, prefer one bill-holder to another, as long as the fund lasts, is, it seems to me, condemned by the *words* of the charter, and by a vast body of law in *context* with the charter—by all the law that exists on kindred subjects. And here I might stop, for when the answer which the " words" and the " context" give is free from doubt, we are not at liberty to go fur-

ther in search of meaning—to go to the "*effects and conse-quences*", to the "*spirit and reason*" of the law.

But I will add a word as to the "*effect*" of the rule, that would allow the stockholder a chance to prefer one bill-holder to another.   When a bank suspends specie payments, its bills fall at once below par, and this, no odds what may be the amount of its ultimately available assets.   If there is distrust of these, the fall is great in proportion to the distrust.   The exis-tence of an ultimate liability on the part of the stockholders to redeem the bills, presents but a slight resistance to the down-ward tendency of the value of the bills.   This experience has proved.   Now, this rule gives the stockholder the full benefit of the depreciation, whatever it may be, and therefore the rule makes it to his interest that the bills should depreciate as much as possible.   All he has to do is, to buy up bills to an amount equal to the value of his stock, and be discharged.   He will not be fool enough to wait for judgments to be obtained against him on bills for the full amount of the bills.   Before the time has come for such judgments to be rendered, he will have volunta-rily redeemed bills to an amount equal to the amount of his stock, i. e. will have bought them up at the lowest price at which they may be selling in the market, and having done that, all else he will have to do will be to plead them to such suits as may be pending against him on other bills—and what means and facilities have stockholders for aggravating the deprecia-tion of the bills of their bank, as by misrepresenting the condi-tion of the bank ; by misrepresenting the condition of the indi-vidual stockholders ; by misrepresenting the quantity of bills to be redeemed ; by misrepresenting the quantity that each stockholder has already redeemed ; by misrepresenting the market price of the bills ; by threatening all sorts of defences to suits upon the bills, and so forth and so forth.   Admit that bank stockholders may be as honest as other men, yet why tempt the most honest men in this way ?   Why, indeed, give them the benefit of that depreciation, which at best, is inevita-ble on bank suspension ?   Would not the rule be far better if it were such as that is which is applied to executors and adminis-

trators—to Sheriffs having money on which there are several judgment claimants—to the *receiver* appointed by the Legislature for the distribution of the assets of *this* and other broken banks, viz: that the fund is to be divided out among all the claimants upon it, *who have given notice of their claims, pro rata*—and that if it be divided out otherwise, it shall be at the peril of the depository of the fund.

I am aware that a decision of this Court was quoted in support of what I am now combatting, that made in *Bothwell and others vs. Sheffield and others*, (8 *Ga. R.* 569.) That case was one in which the sureties of a Sheriff asked for an injunction to restrain a number of suits, which had been brought against them on their bond, suggesting that the amount of the demands in the suits exceeded the amount of the bond, and praying that "the Court would so direct the recoveries, that the creditors first entitled, should recover to the amount of their bond; and the remainder be restrained from prosecuting their suits against the sureties", and in which the Superior Court, on demurrer, dismissed the bill "on the ground that complainants had a complete Common Law remedy"—a decision which was affirmed by this Court. This is the whole case. The opinion is contained in eight lines, and is put exclusively upon a Statute at that—an Act of 1847. (*Pamph.* 201.)

This *judgment* was, I think, right, even without any Statute to give it special support. Those sureties, as far as I can see, had no more need of the aid of a Court of Equity to protect them from the overplus of suits, than has an executor or administrator the need of the aid of such Court to protect him from an overplus of suits against him, i. e. from suits on demands which exceed the value of the assets. The executor or administrator, may, at law, plead the state of the assets and of the debts relatively to each other, and at law the plea will be to him an ample protection. I see no reason why the sureties on a Sheriff's bond may not do a similar thing. Hence, I think the *judgment* in the case was right. If the *opinion* of the Court has in it more than this, the excess is but an *obiter dictum*. I doubt, however, whether it has more.

But as I have said, I do not think the rule of the majority of the Court is right in its *great* principle—that by which it gets the *quantity* of the individual property of the stockholders, which is liable for the ultimate redemption of the bills of the bank. That principle is, to take the *value* of the stock as the measure of the quantity of the individual property—the value at the *fixed rate* of $100 a share. This principle, I think, is condemned by the words of the charter—by the context—by the argument—from effects and consequences, and by that, from the reason and spirit of the policy, establishing an individual stockholder liability.

First, as to what the "*words*" say. The words are, "The persons and property of the stockholders shall be pledged and held bound" "for the ultimate redemption of the bills or notes issued by said bank." By the expression "bills or notes issued", I understand is meant *all* the bills or notes lawfully issued. If I am right in this, then the positive command of the words is, that the property of the stockholders shall be bound for the ultimate redemption of *all* the bills issued by the bank. Now, if the property is to be bound for the ultimate redemption of all the bills, of course *enough of it* is to be bound so to redeem all. That is to say, an amount of property is to be bound equal *to the amount of bills in circulation needing ultimate redemption.* The amount of such bills may, it is true, happen to be just equal to the *value* of the stock, though the chances are many against it. The amount will almost always be either greater or less than the value of the stock. For, by another part of the charter, the bank may issue bills to any amount, which shall not exceed "three times the amount of their capital stock actually paid in, over and above the amount of specie actually deposited in the vaults for safe-keeping." Supposing all the capital stock of the bank paid in, viz: $1,000,000, and that the bank had on actual deposit another $1,000,000 in specie—then it might issue bills to the amount of $4,000,000—that is to say, to an amount exceeding by $3,000,000 the value of its capital stock, rated at $100 a share. But if, in such case, the bank should issue $4,000,000 in bills, the amount of individual

property of the stockholders which would be liable for the ulti-
mate redemption of the $4,000,000, would, according to the
rule of the majority of the Court, be an amount of the value of
no more than $1,000,000, for it would be an amount of a value
equal merely to the value of the stock, rated at $100 a share,
and the value of the stock at that rate, would be only $1,000,-
000.    Yet the *words* say that property enough is to be bound
to redeem every bill lawfully issued.

Again, the "words" say that "the persons and property"
shall be bound "in proportion to the *amount* of shares *and* the
*value* thereof."    This rule, for ascertaining the amount of pro-
perty liable, entirely rejects the words, "the *amount* of the
shares" and confines itself exclusively to the words "the value
thereof."    But the two sets of words are not synonymous.
The first set means the *number* of the shares, irrespective of
their *value*.    And the quantity of individual property liable,
is to be got by a *proportion* in which one of the terms is made
up, in some way, *both* of the *number* of the shares *and* the *value*
of the shares.    This principle absolutely rejects from the case
the element or ingredient, the *number of the shares*, although
the words put that element as much in the case as they do the
element, the value of the shares.    And, indeed, upon the prin-
ciple that it is the value of the shares which is to be the measure
of the quantity of individual property liable, it seems to me
*impossible* to do any thing else than reject the words, "the
amount of the shares."    Yet these words have a plain mean-
ing.    The language of the charter is amount of shares as well
as value of shares—the language of this principle is value of
shares only.    So much for the condemnation of the principle
that comes from the "*words*" of the charter.

The condemnation from the context is, I think, if possible,
more decided.    I have examined, I believe, all of the corpora-
tion charters which contain provisions similar to that contained
in this eleventh section of the charter of this bank.    Most of
those charters are for banks, but some are for rail-roads, some
for insurance, and some, perhaps, for other purposes.    There are
thirty or more of them ; and as to the times of their creation, they

range through a period of almost forty years, from Dec. 1818, when the Bank of Darien was incorporated, to Feb. 1854, when the South-Western Bank of Georgia was incorporated. The expression used for ascertaining the amount of separate property of the stockholder that is to be liable for the redemption of the debts of the corporation, is not the same in each charter. In some charters, the expression is in proportion to the "amount of the value" of the stock; in some, in proportion to "the amount of the shares"; in some, in proportion "to the number of dollars issued on each share"; in some, in proportion "to the amount of stock"; in some, in proportion "to the number of shares"; in some, in proportion "to the shares"; in some, in proportion "to the stock". In one, (the Bank of Columbus,) the expression for the common stockholders, is one thing; for the State as a stockholder, another; for the farmer, the expression is in proportion " to the amount of the shares"; for the latter, in proportion " to the amount of *the value* of shares", both expressions being contained in the same section. (*Pr. Dig.* 86.) In one, that of the Manufacturer's & Mechanic's Bank of Columbus, incorporated in 1852, the expression is, " that the persons, &c. shall, at all times, be bound for an amount equal to the proportion of stock which he, &c. shall own". (*Pamph.* 1852, *p.* 35.) The provisions in the other charters may be found at pages 70, 88, 93, 96, 102, 105, 108, 112, 117, 123, 131, 314, 334, 352, 367, 377, 408, 415, of *Prince's Digest*, and pages 38, 44 of the Acts of 1851–2, and pages 163, 167, 170, 177, 178, 182, 186, 191, 195, of the Acts of 1853–4.

In *this* charter, the expression, it will be remembered, is " the amount of shares *and* the value thereof."

Now, what I have to say is, that the principle that the amount of the property of the individual stockholders is to be found by finding the amount of the value of their stock, will not work through all of these charters. It will not work in those in which the expression is, "the amount *of the shares*", or "the number of dollars issued on each share", or "amount of the stock", or " amount equal to the proportion of stock",

or "number of shares", or "to stock", or "to the shares". And those charters in which some of these is the expression, are the great majority.   The principle will only work in those charters in which the expression is, "in proportion to the *value*", and these are comparatively few; and even in one of these, that of the Bank of Columbus, it will not work throughout all the stockholders, but only through a part of them, leaving the other to be governed by some different principle.

The defect of the rule, in this respect, may be well illustrated by the case of the clause in the charter of the Bank of Columbus.   By the clause in that charter, the common stockholders are to be liable in proportion to "*the amount of their shares*"; the other stockholder, the State, in proportion "to the amount of the *value* of the shares".   The amount or *number* of the shares of the State and the other stockholders, respectively, may be, say 100, the *value* $10.000.   This principle will tell you that the State is liable for $10.000, but it can not tell you what the other stockholders are liable for.   And yet, can there be a doubt of its having been the intention of the Legislature, that in such a case, the State and the other stockholders were, respectively, to be liable for precisely the same sum?

This defect in the principle may still more clearly be shown, by a reference to those charters in which the words are, "in proportion to the number of dollars issued on each share".   In these charters, it is manifest that the principle utterly fails to give any solution.

Now I think it was the intention of the Legislature, that in the case of each of these charters, the extent of individual liability of the stockholders, was to be ascertained in precisely the same way—by precisely the same rule.   The principle of the majority of the Court cannot be true, if the intention were this.

So much for the present, as to what the context says.

As to the " effects and consequences" of this principle, if it is allowed to be the true one, they have already been slightly adverted to, when it was said that for the ultimate redemption

of all bills, over and above an amount equal to the value of the stock, this principle furnishes no security from the individual property of the stockholders. And can it be said that those bills, thus issued in excess, are just the bills that need no such security—just the bills the Legislature wished to encourage the issue of?

And in connection with this topic I may ask, what was the "reason and spirit" which actuated the Legislature in putting provisions of this kind into bank charters? Was it not to get the bills of the banks paid—if possible, paid by the banks themselves; if not possible, by the banks, then by the stockholders; at all events, to get the bills paid? If this was the spirit and reason—if this was the end, and if this end was to be accomplished by first subjecting the property of the bank to the payment of the bills, and when that gave out, then by subjecting the property of the individual stockholders to their payment, is it to be presumed that the Legislature would subject, of that individual property, either more than enough to accomplish the object, or less than enough, or not rather just enough? It is not to be presumed, therefore, that the amount of the individual property of the stockholders, which the Legislature intended so to subject, was an amount equal to the value of their shares, for this value, would in more, probably, than nine hundred and ninety-nine cases out of a thousand, be an amount which would be either greater or less than the amount of the bills to be redeemed by it.

These are my objections to the rule which the majority of the Court deduce from this eleventh section of this charter.

I will now state what I conceive to be the true rule to be deduced from that section, and why I so do.

I think the following propositions are true:

1. The quantity of property of all the stockholders which is liable for the ultimate redemption of the bills of the bank, is a quantity just equal to the quantity of bills to be so redeemed.

2. This quantity of property is to consist of separate parcels, a parcel to be supplied by each stockholder.

3. Of these parcels, the quantity of any one is to be such

that it shall bear to the aggregate quantity of all the parcels, the same proportion which the quantity of stock belonging to the stockholder to supply that parcel, bears to the aggregate quantity of the stock of all the stockholders.

4. Of the aggregate quantity of these parcels, such a portion is to be advanced by all the stockholders, at any one time, as shall be sufficient to satisfy the demand upon that aggregate quantity, existing at that time; that is, as shall be sufficient to pay off the bank bill or bills, which may, at that time, be demanding ultimate payment.

5. Of this portion, thus to be advanced by all the stockholders, at any one time, the part to be advanced by any one stockholder, is to be such that it shall bear to the whole portion to be advanced by all, the same ratio which the parcel of that stockholder bears to the aggregate of the parcels of all the stockholders.

.· 6. And as this parcel bears to the aggregate of all the parcels the same proportion—the same proportion which the quantity of stock belonging to the stockholder owning the parcel, bears to the aggregate quantity of all the stock; therefore,

. 7. The part to be advanced at any one time, by any one stockholder, is to be such that it shall bear to the part then to be advanced by all, i. e. to the amount of the bill or bills then to be paid, the same proportion which the stock of that stockholder bears to the whole stock.

This result is the same, in effect, as that to which the Court below arrived: which was, that the bill-holder, in this case, had the right to recover of this stockholder, such a proportion or per cent. of his bills, as the stock owned by the stockholder bore to the whole stock. It is the same, in effect, as that to which this bill-holder, himself, and his Counsel, Mr. Dougherty, *first* arrived. The suit in this case was originally framed so as to demand no more of the stockholder than what he would, according to this result, have to pay. And the declaration remained in this form for years, I believe. Recently, it was amended so as to make it conform to the rule considered by

the majority of this Court the right one.   And in the course of the argument, one of the Counsel for the plaintiff stated that the idea of the amendment was not original with him— that he got it from something which he read in a decision of this Court in some one of the bank cases.   This is the result to which the other party, the stockholder, arrived; I may therefore say, that this result of mine is one in which the parties on both sides, if left to themselves, as well as the Court below, would agree with me.   Have I not the right, therefore, to insist that this result expresses the *natural and obvious* meaning of the charter—that meaning, according to which, the charter is understood by *all* those who have *an interest* in it ; and to say that at this day, to put another meaning upon the charter is to make the charter operate like an *ex post facto* Law ?

Nevertheless, I will briefly state some of the particular reasons, apart from this, of contemporaneous construction, which make me think the propositions true, on which this conclusion of mine depends.

1. The language of the charter is, that "the persons and property of the stockholders shall be pledged and held bound" " for the ultimate redemption of the bills or notes issued by said bank", &c.   By the words, "bills or notes issued", I take for granted is meant *all* of the bills or notes lawfully issued. If so, then, the amount of the language is, that as much of the property of the stockholders as shall be sufficient for the ultimate redemption of all the bills thus issued, shall be bound for the ultimate redemption of all such bills.   The language does not say that more than as much as this shall be bound ; and as there can be no other reason than a positive command of law, why more should be bound, I say no more is bound.. Hence, I think my first proposition is true ; and that is the leading one.   If it is true, the rule laid down by this Court cannot be true.

2. That the quantity of property so bound, is to consist of parcels of some sort, to be supplied by each stockholder, I be-

Lane vs. Harris.

lieve nobody disputes. I assume, therefore, my second proposition to be true.

3. The language of the charter is, that "the persons and property of the stockholders shall be pledged and held bound, in proportion to the amount of shares and the value thereof, that each individual or company may hold in said bank".

Taking my first and second propositions to be true, this language may be so varied as to read thus: "The persons of all the stockholders, and so much of their property as shall be sufficient for the ultimate redemption of all the bills of the bank, shall be bound for that ultimate redemption, such property to consist of parcels—such parcels to be supplied by each stockholder, in proportion to the amount of his shares and the value thereof."

My third proposition, is that of the parcels of property to be supplied by each stockholder; the quantity of any one parcel is to be such that the parcel shall bear to all the parcels taken in the aggregate, i. e. to the whole quantity of property to be supplied by all the stockholders, the same proportion which the quantity of stock belonging to the stockholder who is to supply that parcel, bears to the aggregate quantity of the stock belonging to all the stockholders. This proposition, I think I may safely say, is entirely *consistent* with the words of the section. It does not the least violence to any of those words. It rejects none.

May I not go further, and safely say that this proposition expresses the *natural* and *obvious* meaning of the words? Of the words, "in proportion to" what is the natural and obvious sense? Is it not one which implies the existence of some *proportion?* And is it not the essential characteristic of every proportion to consist of four things, of which the first shall bear to the second, the same relation which the third bears to the fourth? This is the foundation of the "Rule of Three," the great rule in practical arithmetic. To make the words, "in proportion to," equivalent to the words "equal to," is, as it seems to me, to subject the words to some degree of violence.

And if any proportion is implied, the one which is it, there

can, to my eyes, be no mistaking. The property to be supplied by any one stockholder, is to be such a part of that to be supplied by all the stockholders, as the stock of that stockholder is ·of the stock of all the stockholders. As I read the section over, this is the proportion which seems, of its own accord, to rise up out of it to my eyes.

And then this proportion works just as you would have it work. It always brings out the right result—the exact one which you seek for. There are, say, bills calling for ultimate redemption, to the extent of $10.000. Of course, to redeem them, property to the value of $10.000 is to be supplied by all the stockholders, taken in the lump. This term you know.

The amount of the stock of all—the amount of the stock of each—these terms you also know. The term which you wish to know is, what is the particular amount of this property, which each stockholder is ·to supply ? From the three known quantities, how easy it is to come to know that. As the amount of the shares and the value thereof belonging to all the stockholders, is to the amount and value of the shares belonging to all, so is the amount of property to be supplied by all, to the amount to be supplied by one.

And this *same* result, the proportion works out, in whatever sense you take the words, " the amount of the shares and the value thereof"—whether you consider the proportion to be one, " to the amount (number) of the shares" and to "the value of the shares" amount and value taken separately, but both taken; or one to the amount of the shares *added* to the value of the shares; or one to the amount of the shares *multiplied* into the value of the shares. And it will make no difference whether you estimate the value of the shares to be $100—$50—$10 —$1—each. The fourth term in each of the following proportions will be precisely the same quantity. As the amount *and* value, at any rate, of the whole stock is to the amount *and* value, at the same rate of the stock of A, so is the quantity of property to be supplied by all the stockholders to the quantity to be supplied by A. As the *amount* of the whole stock is to the *amount* of the stock of A, so is the whole quantity of pro-

perty to be supplied by all the stockholders, to the quantity to be supplied by A.   As the *value*, at any rate, of the whole stock is to the value,  at the same rate, of the stock of A, so is the quantity to be supplied by all, to that to be supplied by A.

Using this proportion, therefore, you may use all the words of the section, and not have to reject any, as you have to do when you say the quantity of property to be contributed by any stockholder, is to be a quantity equal to the *value* of his shares ;  in which case,  you have to reject the words, " *amount* of the shares *and*".

This proportion, not only thus unlocks this provision of this charter—it equally unlocks the similar provisions of all the other thirty charters in existence.    Take the provision in some of those charters, which is most unlike the provision in this, viz : that in which the quantity of property to be supplied by any stockholder, is to be " in proportion to the *number of dollars* issued upon each of the shares" held by him, and see.    With such a provision as this, the rule of the majority cannot deal at all.

According to the words of this provision, the proportion will have to be as the number of dollars issued on each of the shares belonging to all the stockholders, is to the number issued on each share belonging to stockholder A,  so is the quantity of property to be supplied by all the stockholders to the quantity to be supplied by A.    But this proportion is precisely the same as this : as the quantity of stock of all the stockholders is to the quantity of the stock of A, so is the quantity of property to be supplied by all to the quantity to be supplied by A ; for the number of dollars issued upon each of all the shares is to all the shares as the number issued upon each of A's shares is to all of A's shares.

This third proposition, then, in connection with the first and second, unlocks all of these provisions in the thirty-one charters, and shows the inside of each provision to present precisely the same face—a face of which the leading feature is, that the quantity of property to be furnished by the whole lot of stockholders, is to be a quantity just sufficient to redeem all the

bilis, no odds how many they may be, needing to be redeemed, and of which the next most important feature is, that of this aggregate quantity of property thus to be supplied by all the stockholders—the part to be supplied by any one is to be to the whole quantity as his stock is to the whole stock.

Is not this third proposition then true? I think it is.

The other propositions, the fourth, fifth, sixth and seventh, follow from these three.

The *whole* amount of property to be advanced by *all* of the stockholders at any one time, is obviously to be no more than shall be needed at that time; no more than shall be sufficient to redeem the bill or bills then demanding payment. Admit that there may be other bills outstanding, yet they may never be presented for payment, and so may never require any property to be advanced on their account. And if presented afterwards, they will, equally with those presented then, be within the rule and be entitled to call for an advance from the stockholders, sufficient for the payment of them.

And so it is equally obvious that of this whole amount, thus to be advanced by all the stockholders at any one time, the part to be advanced by any one stockholder, at that time, is to be to the whole so to be advanced by all, as his stock is to the stock of all. He is to pay his part of every bill, as it comes forward for payment, and the other stockholders are to pay theirs. Thus the whole bill will be paid—thus all the bills to be paid will be paid. And this is the end the Legislature had in view.

Will this interpretation of the charter work badly in practice? I think not—but if it did, it being the one which to my mind so clearly results from the words and the context of the charter, I should, myself, have to stick to it. When the words and the context say one thing, and effects and consequences, (the understanding of "learned" Courts, or indeed aught else) say another, a Judge has to go by what the words and the context say. Hence, although a few decisions of other States were cited in the argument of this case, I have laid them entirely aside, as improper to influence my opinion. Upon a

Lane *vs.* Harris.

question as to what is the meaning of an Act of the Legislature of Georgia, a decision from another jurisdiction can, at best, be only irrelevant—impertinent; and this, even when after a resort to the words and context, there may remain some doubt as to what is the meaning. Of the cases thus cited, I took note of two, one in *Wendell's Rep.* 24 *vol.* 478; the other in 10 *Metchalf's Rep.* 526. There may have been some others.

But the practical effect of this interpretation will not be bad —it will be good. The rule it supplies will work easily, and will finish its work as it goes. Is there a bill to be redeemed? Let it present itself to any stockholder and say, " sir as the quantity of your stock is to the quantity of all the stock, so is what you have to pay me on this bill to what the other stock-holders have to pay me—therefore, pay it to me." In a minute, the proportional quantity is found, and the stockholder has nothing to do but to pay it. Does he refuse? if so, on what ground? that he does not like the rule—does not understand the rule? Such do not appear to have been the objections in this case. The stockholder, in this case, understood the rule—it was the one he insisted upon. But suppose the stockholder puts his objection to paying, on other grounds, as for example, that there is nothing due by reason of the bills being void, (say) because issued without authority, or extinguished, or barred by the Statute of Limitations, is his refusal to pay to be set down as evidence that *this rule* works badly?

Let there be no obstacle to payment but this rule itself, and payment will go on as fast as it does in any case where payment has to be got out of different debtors. In every such case, it is necessary that creditor and debtor shall have a meeting— that the debt to be paid shall be presented for payment. So the bill-holder will, in like manner, have to be at the trouble to go round to the stockholders and present his bill to each. And each will be, at least, as likely to pay as any other debtors are— for the costs of suit would become a terrible penalty to such as might refuse to pay.

And then, payment thus made to the bill-holder, would, at one blow, settle *all* rights. The bill-holder will have got only

what was his due. He will have got nothing as to which another bill-holder may say to him, *divide with me.* And the stockholder will have paid only what he owed. He will have paid no more than his share, and will therefore be in no condition to say to the other stockholders, *contribute to me.* Justice, according to law, will have been completely done. The other rule, which allows any bill-holder to collect the whole of each of his bills out of any stockholder whose stock happens to be equal in value to the amount of the bills, is but the beginning of justice. It puts the bill-holder in a condition to be called upon by all the other bill-holders, for an apportionment of his collection among all; and thus to be left, in reality, no better off than if he had at first only taken from the stockholder such a proportion of each of his bills as that stockholder's stock bore to the whole stock. It puts the stockholder in a condition to be allowed to call on all the other stockholders, to contribute to him the part of the bills, over and above his share, which he has paid. Suppose some of the stockholders to be insolvent, and the solvent ones not liable for enough to redeem all the bills, and this rule set to work to adjust rights, generally, the rights of all concerned? That the rule would give rise to more litigation than it would settle, seems to me apparent—litigation of the most tedious, expensive and difficult sort —litigation between bill-holder and stockholder, bill-holder and bill-holder, stockholder and stockholder. And all, at last, when things should be worked out to their final results, only to give to each bill-holder his *pro rata* share of each stockholder's individual property. In medicine, some remedies, it is said, put into the system three diseases for one they take out; but ought this to be the characteristic of any remedy in law?

Again : this interpretation of mine makes the security for the ultimate redemption of the bills of the bank, expand and contract with the bills to be secured. No odds how much these bills may exceed the amount or value of the stock, so they be bills lawfully issued, this interpretation makes the security extend to every bill. For the ultimate redemption of every such bill, it makes the property of the stockholders liable. The rule

of the majority makes that property liable for the redemption of bills to an amount equal to the value of the capital stock, and for none beyond that amount. It is true that that rule increases this security as much as possible, by arbitrarily counting the value of the stock at $100 a share. But to do this, it has, as I conceive, to put a forced meaning on the word value, and even then, the result is a security not sufficient to cover cases contemplated by the charter—those cases in which the amount of bills to be redeemed, exceeds the value of the stock, even when the stock is rated at $100 a share.

This interpretation presents no opportunities to the stockholder, to prefer one bill-holder to another—gives him no chance to discharge his liability, by taking up bills at their depreciated value—offers him no temptation, therefore, to use means to depreciate the value of the bills; in all which respects, also, it is in contrast with the rule of the majority of the Court.

And these are my reasons for thinking this interpretation to be the true one.

I had, therefore, to agree with the Court below, and to disagree with this Court.